**MORTON BUILDINGS OF NEBRASKA, INC., Appellant,**

v.

**MORTON BUILDINGS, INC., et al., Appellees.**

**No. 75–1241.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1976.

Decided March 9, 1976.

Wallace Rudolph, Lincoln, Neb., made argument for appellant; John H. McArthur and A. James McArthur, Lincoln, Neb., on the brief.

Fredric H. Kauffman, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, Neb., for appellees; David R. Buntain, Lincoln, Neb., on the brief.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and BRIGHT, Circuit Judge.

GIBSON, Chief Judge.

Appellant, Morton Buildings of Nebraska, Inc. (hereafter referred to as West),[1] instituted the present action claiming that Morton Buildings, Inc. (Morton), had tortiously interfered with West's business and had conspired with various individuals to violate § 1 and § 2 of the Sherman Act. 15 U.S.C. §§ 1, 2 (1970), *as amended*, (Supp. IV, 1974). The District Court,[2] in a nine day non-jury trial, concluded that West had failed to support these theories and entered judgment in favor of Morton.

---

* The Honorable Tom C. Clark, Associate Justice, Retired, United States Supreme Court, sitting by designation.

1. Morton Buildings of Nebraska, Inc., was formerly a sole proprietorship and later a corporation which was owned, controlled and directed by E. H. "Bill" West. To avoid confusion, appellant will be considered as the personal operation of West and be referred to as West, and Morton Buildings, Inc., an Illinois corporation, will be referred to as Morton.

2. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska.

Morton manufactures prefabricated wood-framed, metal-covered buildings which are primarily used for various farm and commercial purposes. Morton buildings are distributed through a multistate distribution system, consisting of Morton-owned sales offices as well as a number of independent dealers. In August, 1968, Morton established an independent dealership in Lincoln, Nebraska, and authorized West to sell and erect Morton buildings in that area. The dealership contract between Morton and West was oral and was terminable at will by either party.

Throughout the course of the dealership a number of conflicts developed between West and Morton. These problems purportedly arose due to West's failure to cooperate with Morton and his reluctance to conform to established Morton procedures. In late 1970 Morton offered its independent dealers the opportunity to adopt the "Morton system", which was a multifaceted plan conceived by Morton to establish some uniformity in the operational aspects of the Morton distribution system. Pursuant to the Morton system salesmen were compensated on a salary rather than commission basis and independent dealers were required to maintain a specified inventory of Morton-approved equipment. In addition, the Morton system offered its dealers access to a centralized computer system which could prepare payroll checks, pay accounts payable, file tax returns, prepare monthly profit and loss statements, and analyze the profitability of salesmen.

At the urging of Morton, West permitted the Morton system to supplant West's previous operational system in January, 1971. In order to facilitate the transition Morton cosigned a $36,000 note for West to enable West to purchase the necessary equipment under the new system. The services available through the Morton computer system were instituted on March 1, 1971.

Further problems continued to materialize in the relationship between Morton and West. There are many charges and countercharges flowing to and from the parties, and what the actual situation was at that time is difficult of ascertainment. Although West did $700,000 worth of business in 1970, his net worth by his own figures at the end of that year was $20,000. Obviously, West's business was undercapitalized. He had been on a cash basis with Morton since the inception of the dealership and had to prepay the entire cost of any buildings ordered from Morton. In addition to West's financial difficulties, Morton attributed the dissatisfaction between the parties to the complaints of West's customers, dissention among West's employees, and West's abdication of managerial responsibilities. On the other hand, West contends that his problems were caused by Morton's implementation of a deliberate and conspiratorial plan to take over all of West's operations and to effectively destroy West as a future or potential competitor.

On April 22, 1971, Morton representatives traveled to Lincoln, Nebraska, to seek resolution of the various problems confronting the parties. The representatives communicated Morton's view of West's problems to West and Kenneth Bickel, who had assumed managerial responsibilities from West. West and Bickel were informed that if the situation had not improved in 30 days the dealership would be terminated. On April 23 West telephoned Arnold Reiff, a Morton supervisor, and stated, "If I'm going to get the axe, let's get it over with." Morton officials then met with West on April 27 and a termination agreement was negotiated. Morton presented facts which indicate that negotiations were conducted concerning various contractual terms and that all parties on a give-and-take basis manifested assent to the final provisions embodied in the agreement. These provisions were then set forth in a memorandum prepared by William Uphoff, general manager for Morton, and submitted to but never signed by West. It appears that West commenced performance of the agreement but later became disenchanted and rejected it. West contends that he did not enter into any agreement with Morton and that the termination was unilaterally imposed by Morton. Alternatively, West asserts that, even if an agreement is found, it is voidable at his

option because his assent was induced by misrepresentation and duress.

West seeks $750,000 damages for Morton's alleged tortious interference with West's business. Additionally, West contends that Morton violated various provisions of the antitrust laws and that the court should permit West to recover treble damages totaling $2,250,000. The District Court resolved the facts adversely to West and concluded that West was not entitled to prevail under either theory nor was West entitled to a judgment for $9,549.11 allegedly owed under Morton's contract theory of termination.

## I. *Tortious Interference Claim.*

West's initial claim, in count one, is based on the theory that Morton tortiously interfered with West's business by conceiving and implementing an anticompetitive plan to take over all of West's operations.[3] In furtherance of this plan Morton allegedly interfered with West's internal affairs, overburdened West financially, misrepresented financial information and forced West to agree to a termination of the dealership, and then appropriated West's employees, assumed all West's contracts and took over all of West's customers and leads. Morton presented evidence tending to refute these contentions.

■ While the pleadings of tortious interference are sufficient, a resolution of the factual disputes is dispositive of this claim. Nebraska law, which concededly controls in this diversity segment of West's claim, clearly provides that a person may discontinue a terminable at will business relationship with another person even though intended or unintended harm results. *Buhrman v. International Harvester Co.,* 181 Neb. 633, 634, 150 N.W.2d 220, 222–23 (1967); *Barish v. Chrysler Corp.,* 141 Neb. 157, 163, 3 N.W.2d 91, 95 (1942). However, if a person terminates a dealership by using improper means which are accompanied by an anticompetitive intent or purpose, he

may be liable in tort to the injured party. *Frank H. Gibson, Inc. v. Omaha Coffee Co.,* 179 Neb. 169, 178, 137 N.W.2d 701, 708–09 (1965). The District Court's findings of fact generally reflect Morton's theory of the case and, upon applying applicable principles of law to these facts, the District Court concluded that Morton had not engaged in an anticompetitive campaign to destroy West as a competitor.

■ We have independently reviewed the record in its entirety and conclude that the District Court's factual findings are not clearly erroneous. Fed.R.Civ.P. 52(a). It is unnecessary to make a lengthy and detailed recitation of all the facts which tend to justify Morton's actions in this matter and give sufficient support to the District Court's factual findings. In general, the evidence indicates that there were numerous conflicts between Morton and West prior to the termination. West was experiencing dissention among personnel, management difficulties and a certain degree of financial instability. When Morton ordered West to remedy the existing problems, West voluntarily chose to discontinue the dealership. The parties negotiated and consented to a termination agreement. Contrary to West's allegations the evidence does not adequately prove an attempt by Morton "to steal a business by taking unfair advantage of a business relationship." *Frank H. Gibson, Inc. v. Omaha Coffee Co., supra* at 178, 137 N.W.2d at 708. Despite West's selective reference to facts in the record which allegedly undermine the District Court's findings, the factual findings made by the District Court are supported by the record. Morton did not utilize any unlawful means to effect a termination of the West dealership and did not entertain the requisite anticompetitive intent.

West contends that the termination agreement must be vitiated because West's consent was induced by misrepresentation and duress. At the termination meeting on April 27, 1971, Morton prepared a financial

---

**3.** West does not dispute that Morton was authorized to terminate the dealership pursuant to the dealership agreement. However, West contends that the means used by Morton to effect the termination constituted tortious interference.

statement which represented that West had lost $45,000 in the first quarter of 1971. It was later ascertained that the true loss for the quarter was $10,000. While the record does not indicate whether this misstatement was intentional or inadvertent, it does indicate that West apparently had many contracts for buildings that remained on location, unerected, thus making it difficult to ascertain West's actual financial condition. West asserts that this misrepresentation of his financial condition renders the agreement voidable at his option.

■ Nebraska law requires an aggrieved party to show the materiality of a misrepresentation as a precondition to receiving a judicial declaration that the contract is not binding on him. *Garbark v. Newman,* 155 Neb. 188, 195, 51 N.W.2d 315, 322 (1952). Materiality is described as follows:

> If a misrepresentation is likely to affect the conduct of a reasonable person with reference to a transaction with another person, it is generally material to the contract * * *.

*Garbark v. Newman, supra* at 196, 51 N.W.2d at 322.

West has failed to establish the materiality of the misrepresentation in this case. Morton had apprised West of numerous problem areas in West's operation. West's decision to terminate obviously was based upon the realization that the accumulation of these problems rendered the continuation of the dealership difficult and potentially unprofitable. Due to the number of problems which necessarily induced West to enter into the termination agreement, there is no indication that West would not have agreed to the termination or otherwise modified his conduct if he had been informed of his lesser degree of financial instability. West had independent knowledge that he was encountering financial difficulties. He was aware that his sales had decreased and that

there was a substantial monthly drain on his financial resources. Morton's misstatement, which related only to the degree rather than the fact of financial difficulty, did not appear to be material under the circumstances of this case.[4]

■ West's contention that he consented to the termination agreement under duress or business coercion was not proved. The record is devoid of any credible evidence that West was subjected to "such pressure or constraint as compels a man to go against his will, and takes away his free agency, destroying the power of refusing to comply with the unjust demands of another." *Buhrman v. International Harvester Co.,* 181 Neb. 633, 634, 150 N.W.2d 220, 223 (1967).

■ The District Court found that Morton did not attempt to lure away West's employees prior to the termination, nor was there any attempt by Morton to cause dissention among the employees during that period of time. After the termination Morton offered the West employees an option of either remaining with the Morton distribution system or continuing with West. Most of the salesmen and crewmen accepted the offer of employment with Morton. Although some of these actions appear questionable, we cannot, in view of the court's finding of a voluntary agreement of termination, say that Morton's offers of employment constituted tortious interference.

■ The Nebraska law is not well-defined on the question of whether and under what circumstances the hiring away of a competitor's employees constitutes tortious interference. The generally accepted rule is that a person may offer employment to a competitor's employee if the employment relation between the competitor and employee is terminable at will and if legal

---

4. The record presents serious questions as to whether West adequately proved that he reasonably relied on the misrepresentation. *Cf. H. W. Abts Co. v. Cunningham,* 95 Neb. 836, 146 N.W. 1036 (1914). Morton presented evidence showing that West had a document prepared which listed West's profits from building contracts being assumed by Morton. This document was discussed at the termination meeting of April 27, 1971. The existence of this West-prepared document indicates that West possessed first-hand knowledge of his financial condition and could not have credited Morton's statement of West's losses.

and proper means are used to effect the termination.[5] If the acquisition of a competitor's employee is actuated by malice, noncompetitive considerations or other improper or illegal motives, a claim for tortious interference can be maintained.[6] In light of the evidence in this case we are unable to say that Morton's motivation in offering employment to West's employees was impermissible or anticompetitive. Since the dealership was voluntarily terminated by the parties, Morton's offers of employment to West's employees were not accompanied by a conspiratorial breach of a collateral contract as in *Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.,* 112 F.2d 101, 108 (8th Cir. 1940). The record shows that West's four-man sales force was disenchanted with the West operation. The evidence indicates that this disenchantment was caused by the activities of West's manager, not Morton. One salesman had discontinued his employment, another had tendered a resignation letter, and a third was selling very few Morton buildings. In his resignation letter one salesman complained that West was listening to his private telephone calls. Morton's offers of employment afforded West's employees an opportunity to seek relief from the deteriorating conditions at West and thus permitted the employees to promote their own self-interest. *Cudahy Co. v. American Lab-*

*oratories, Inc.,* 313 F.Supp. 1339, 1347–48 (D.Neb.1970). Since the termination agreement placed on Morton the responsibility of completing all building obligations previously incurred by West, it was reasonable for Morton to offer employment to West crewmen and to enable the crewmen to continue construction at the existing job sites. Morton offered no inducement to the employees; it merely notified them of the availability of employment if they chose not to stay with West. There is no evidence that Morton's actions were motivated by any improper or illegal purposes. *See A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957).

## II. Sherman Act § 1 Claims.

West contends that Morton conspired with various individuals to tortiously interfere with West's operations and to destroy West as a future competitor. It is alleged that this conduct contravened § 1 of the Sherman Act.[7]

▉ It is difficult to derive from West's pleadings and proof exactly who participated with Morton in the alleged conspiracy. To the extent that West bases his theory on a conspiracy between Morton and the individual defendants, the action cannot be maintained. The individual defendants were, at the time of the allegedly illegal

---

**5.** *E.g., Viavi Co. v. Vimedia Co.,* 245 F. 289, 292 (8th Cir. 1917), *cert. denied,* 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928 (1918); *National Oil Co. v. Phillips Petroleum Co.,* 265 F.Supp. 320, 330 (W.D.Wis.1966); *Sarkes Tarzian, Inc. v. Audio Devices, Inc.,* 166 F.Supp. 250, 264 (S.D.Cal. 1958), *aff'd per curiam,* 283 F.2d 695 (9th Cir. 1960), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961); *National Rejecters, Inc. v. Trieman,* 409 S.W.2d 1, 34 (Mo.1966); *see Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.,* 112 F.2d 101, 108 (8th Cir. 1940); *Restatement of Torts* §§ 766–68 (1939). *See generally* Annot., 24 A.L.R.3d 821, 826–35 (1969).

**6.** *Heyman v. Kline,* 344 F.Supp. 1110, 1115 (D.Conn.1970), *rev'd on other grounds,* 456 F.2d 123 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *Globe & Rutgers Fire Ins. Co. v. Firemen's Fund Fire Ins. Co.,* 97 Miss. 148, 159, 52 So. 454, 455 (1910); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 633, 136 A.2d 838, 847 (1957). *See*

*generally* Annot., 24 A.L.R.3d 821, 835–50 (1969).

**7.** Section 1 of the Sherman Act provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (1970), *as amended,* (Supp. IV, 1974).

practices, officers or agents of Morton. Since more than one person or entity is required to establish a conspiracy, the general rule is that a conspiracy cannot be based on an agreement between a corporation and its officers, agents or employees.[8] The only exception arises when the officers or agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit. *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir. 1974); *Johnston v. Baker,* 445 F.2d 424, 427 (3d Cir. 1971). Such is not the situation in this case.

 In his complaint West asserts the existence of a conspiracy between Morton and certain unspecified employees of West. The District Court concluded that no conspiracy to destroy West was proved. We need not determine whether the present record establishes sufficient joint or collaborative activity between Morton and West's employees to constitute a conspiratorial agreement.[9] Assuming, *arguendo,* that such an agreement may be implied, the record utterly refutes the contention that the resulting conspiracy was one that restrained trade, as required by § 1. The dealership termination was consummated for valid business reasons. Morton did not tortiously interfere with West as a competitive force. Morton's conduct did not approximate the degree of interference and anticompetitive activity required to sustain a claim pursuant to § 1 of the Sherman Act. *Craig v. Sun Oil Co.,* 515 F.2d 221, 223–24 (10th Cir. 1975); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d

547, 561–62 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Metal Lubricants Co. v. Engineered Lubricants Co.,* 411 F.2d 426, 431–32 (8th Cir. 1969).

In his complaint West alleges that Morton imposed illegal territorial restrictions on West's dealership. It appears that Morton attempted to limit intrabrand competition by establishing a "protected area" for each dealer embracing 50 miles in radius in which no other dealer was permitted to market Morton buildings. A dealer was permitted to market Morton buildings in any geographic region as long as he did not impinge upon another dealer's "protected area". West contends that these vertical territorial restrictions are in contravention of the per se rule adopted in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

 West's complaint specifies that Morton's alleged antitrust violations enabled Morton to "take over [West's] business and eliminated [West] as a competitor for the sale and construction of Morton buildings in the Nebraska territory * * * ." However, West was not eliminated as a competitor nor precluded from selling comparable products. West worked for two of Morton's competitors, selling 100 buildings during the three years following the termination of the relationship with Morton. Furthermore, the District Court reviewed the facts and found that noncompliance with the territorial restrictions played no part in Morton's decision to give

---

8. *Bellamy v. Mason's Stores, Inc., (Richmond),* 508 F.2d 504, 508 (4th Cir. 1974); *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71, 82 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Goldlawr, Inc. v. Shubert,* 276 F.2d 614, 617 (3d Cir. 1960); *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914–15 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *cf. National Dairy Products Corp. v. United States,* 350 F.2d 321, 334 (8th Cir. 1965), *vacated on other grounds,* 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995 (1966). *See generally* Annot., 20 A.L.R.Fed. 682, 710–18 (1974).

9. It is necessary to prove the existence of at least an implied agreement as a prerequisite to establishing a conspiracy. The Supreme Court of the United States has liberalized the proof requirements in this regard by permitting the finding of an implicit conspiratorial agreement between parties, some of whom have marginal involvement in or awareness of the overall scheme. *Albrecht v. Herald Co.,* 390 U.S. 145, 150 & n. 6, 88 S.Ct. 869, 871, 19 L.Ed.2d 998, 1002 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–513, 4 L.Ed.2d 505, 515–517 (1960). We note in the present case that West's employees did nothing more than accept a permissible offer of employment from Morton.

West the termination ultimatum. This finding is not clearly erroneous. Since we affirmed the District Court's finding that West voluntarily agreed to the termination, West obviously forfeited any claim that he might have relating to illegal termination of the franchise. A litigant is entitled to recover only for those injuries occasioned "by reason of" violations of the antitrust laws. *Reed Brothers, Inc. v. Monsanto Co.,* 525 F.2d 486, 494 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645, 44 U.S.L.W. 3398 (1976); 15 U.S.C. § 15 (1970). West's alleged injury in this case was the deprivation of a business opportunity and this injury is wholly unrelated to Morton's imposition of territorial restrictions.[10] The District Court properly concluded that Morton had not violated § 1 of the Sherman Act.

III. *Sherman Act § 2 Claims.*

West contends that Morton either monopolized or attempted to monopolize the distribution of Morton-type buildings in Nebraska. However, West has completely failed to support these contentions with sufficient facts and has not proved the essential elements of a § 2 violation.[11]

 The monopolization offense pursuant to § 2 entails two distinct elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1966); *see United States v. E. I. du-*

*Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1240 (8th Cir. 1973). As a prerequisite to recovery under this theory the plaintiff must properly delineate the relevant market, which is comprised of a geographic and product market.

 The geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359, 363 (1973); *United States v. Grinnell Corp., supra,* 384 U.S. at 575–76, 86 S.Ct. at 1706, 16 L.Ed.2d at 788–789 *aff's except as to decree,* 236 F.Supp. 244 (D.R.I.1964); *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 455–56 (9th Cir. 1966), *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967). West has not adequately described the competitive structure of Morton-type buildings and there is an absence of market data from which we can assess the effective area of competition. Consequently, we are unable to discern whether the relevant geographic market should be a small portion of Nebraska, the entire state of Nebraska or a larger geographic area.

The record likewise fails to present adequate probative evidence bearing upon the relevant product market. West has not sufficiently identified what types of buildings are reasonable interchangeable substitutes for Morton buildings within the appropriate area of competition. *United States v. E. I. duPont de Nemours & Co., supra,* 351 U.S. at 395, 76 S.Ct. at 1007, 100

---

**10.** West's complaint did not allege that West was seeking recovery for profits lost due to the territorial restrictions. Even if we were to liberally construe the complaint to encompass such a claim, the record fails to demonstrate that West's profits were diminished due to the restrictions. The District Court properly found that West failed to prove that he was injured in any respect by the territorial restrictions.

**11.** Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire

with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2 (1970), *as amended,* (Supp. IV, 1974).

L.Ed. at 1280. Although the record illuminates Morton's own sales and marketing activities, there is an absence of market data, figures or other relevant material adequately describing the nature, cost, usage or other comparative features of competing products. In the absence of such proof courts are incapable of determining the extent of cross-elasticity of demand in the market. In light of West's manifest failure to support his § 2 monopolization claim, the District Court properly granted judgment for Morton on this issue.

■ West contends that it is not necessary to define the relevant market in order to successfully maintain an attempt to monopolize claim. Based upon the precedential authority of this court this contention is clearly without merit. We have consistently held that proof of the relevant market is a requisite element in an attempt to monopolize case. *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1240 (8th Cir. 1973); *Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 285–86 (8th Cir.), *cert. denied*, 414 U.S. 1022, 1032, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973). West was not entitled to judgment on any aspect of his § 2 claim.[12]

IV. *West's Motion to Amend Judgment.*

■ We believe that, since the District Court credited Morton's defense of a voluntary termination agreement,[13] the District Court erred in not rendering a judgment for West on whatever was due under the termination contract. The termination agreement, admitted in evidence at trial,

expressly entitled West to the profits from the buildings which were uncompleted on April 27, 1971, and which Morton agreed to complete. The testimony elicited at trial indicates that these profits have not been tendered by Morton. In a post-trial motion to amend judgment West requested the District Court to enter a judgment in West's favor for the amount of these profits. The District Court denied the motion on the basis that West's theory of the case did not encompass this type of relief.

■ West alleges in his complaint that Morton had "[c]onverted to its own use monies payable to [West] * * *." This broad allegation obviously manifests the fact that Morton has been withholding funds which rightfully belong to West. We believe West adequately developed his right to the profits at trial. Although West did not specifically request this form of relief in his complaint, the law clearly provides that a plaintiff is not strictly bound by the prayers for relief in the complaint; the trial court is obligated to enter judgment in favor of plaintiff for any appropriate relief mandated by the evidence adduced at trial. *Williams v. United States*, 405 F.2d 234, 238 (5th Cir. 1968); *Nagler v. Admiral Corp.*, 248 F.2d 319, 328 (2d Cir. 1957); J. Moore, *Federal Practice* ¶ 54.62 (1975); Fed.R. Civ.P. 54(c); *cf. Armstrong Cork Co. v. Lyons*, 366 F.2d 206, 209–10 (8th Cir. 1966). We therefore remand the case to the District Court for an entry of judgment in favor of West for all sums found to be owing West under the termination agreement.[14]

---

**12.** The record clearly shows that West cannot maintain a claim based on a conspiracy to monopolize. There is no evidence from which we can infer the requisite specific intent on the part of the alleged co-conspirators. *United States v. Yellow Cab Co.*, 332 U.S. 218, 227–28, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010, 2018 (1947); *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir. 1975).

**13.** In its findings of fact the District Court stated:

Uphoff and Kenneth Weaver came to Lincoln, Nebraska, on April 27, 1971, to accomplish the termination of West's dealership. At a meeting involving these parties and Ar-

nold Reiff, an agreement for termination was reached by and between the plaintiff and the defendant Morton Buildings, Inc.

There is no dispute that West is entitled to certain sums pursuant to the termination contract and there is no question as to Morton's willingness to satisfy its obligation. In its brief to this court Morton states: "[Morton] has consistently indicated its willingness to render an accounting under the contract of termination."

**14.** Exhibit 23 indicates Morton owes West $9,549.11 on the profits derived from completing the unfinished building contracts assumed

Affirmed in part, reversed in part. The parties will bear their own costs.

by Morton. According to Morton, any repair charges that are West's liability according to the termination agreement are to be deducted from the above figure.