**Warren EHRICHS, Appellant,**

v.

**Robert D. KEARNEY, Appellee.**

**No. 83–1638.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1983.

Decided March 28, 1984.

Rehearing and Rehearing En Banc Denied April 26, 1984.

Nicholas J. Spaeth, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., for appellant.

Michael D. Nelson, Ohnstad, Twichell, Breitling, Rosenvold, Wanner, Nelson,

Neugebauer & Maring, P.C., West Fargo, N.D., for appellee.

Before HEANEY, ROSS and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Warren Ehrichs appeals from a district court judgment in favor of Robert Kearney on Ehrichs' action for an accounting for the surplus of assets of Ehrichs Manufacturing Company after a foreclosure sale or for recovery of benefits under the theory of unjust enrichment. He alleges that the court erroneously denied him relief under either theory based on an oral agreement whereby Ehrichs transferred ownership of Ehrichs Manufacturing to Kearney. We agree with the district court that the oral stock transfer agreement bars Ehrichs' recovery under the theories pled and argued. The record establishes, however, that Kearney breached his duties under that agreement and that Ehrichs suffered direct monetary damage from that breach. Because neither we nor the district court should be enslaved by technical rules of pleading where the parties fairly try issues not pled, we reverse the district court's judgment in part and remand for entry of judgment in favor of Ehrichs for money owed him personally and as administrator of his deceased mother's estate under the stock transfer agreement.

Warren Ehrichs formed Ehrichs Manufacturing in 1961 as a sole proprietorship. In 1969, he and Charles Gift, as co-owners, incorporated the company with its principal place of business in Fargo, North Dakota. Ehrichs purchased Gift's ownership interest in 1971 and was controlling stockholder from that year until the events surrounding this action.

Ehrichs Manufacturing did custom metal and machine fabrication in addition to manufacturing and marketing several patented products. One of its staple activities was the manufacture and sale of the "Kerbit," a slip-form machine which could lay concrete curb and gutter without the use of forms. Ehrichs Manufacturing built the Kerbit under license from its Australian inventor. The company borrowed heavily to finance its operations, principally from Fargo National Bank. Cash flow problems caught up with the business in the spring of 1979, and the bank accelerated its entire indebtedness of $687,709 for failure to make timely payments. The company could not pay the debt, so the bank sought foreclosure on its security interest in the corporation's inventory, equipment, and intangible assets. Ehrichs signed a "Transfer of Collateral Upon Peaceable Foreclosure and Renunciation" in favor of the bank on April 20, 1979.

Robert Kearney, an Oregon businessman, was visiting Fargo at this time regarding the purchase of Kerbits from, and a possible distributorship agreement with, Ehrichs Manufacturing. He was in Ehrichs' office when bank officials first informed Ehrichs of their foreclosure designs and procured the transfer of collateral on April 20, 1979. Ehrichs, Kearney, bank officials, and others began several days of negotiations regarding the fate of Ehrichs Manufacturing assets and operations after the foreclosure. On April 23, the bank assigned to Kearney its position as secured party in possession of the bulk of the company's assets. At the same time, Ehrichs, Kearney, and Howard and Eugene Dahl agreed to transfer the realty, most of the shop equipment, and some of the inventory of Ehrichs Manufacturing to the Dahls, acting on behalf of their new business Concord, Inc., for $786,900. Kearney gave the bank a $75,000 check to cover back taxes on the company's realty to facilitate this transfer. The sale to Concord raised funds more than sufficient to completely extinguish Ehrichs Manufacturing's debt to the bank.

In the course of these dealings, Ehrichs and Kearney discussed a joint venture to continue the production and sale of the Kerbit. They reached an oral agreement to manufacture and market the machine together, either as Ehrichs Manufacturing or a new corporation. Under this agreement, Ehrichs was to provide the remaining assets of Ehrichs Manufacturing and be in

charge of manufacturing, while Kearney was to supply additional capital—evinced by his prior $75,000 payment to the bank and the execution of a note to borrow another $125,000—and to manage the marketing end of the operation. The outstanding debts of Ehrichs Manufacturing would be paid from its remaining assets and the sale of new Kerbits. A cash collateral account was opened at the bank to collect receivables and discharge the remaining payables of Ehrichs Manufacturing. Ehrichs was to receive a forty-nine percent ownership interest in the new operation with Kearney holding the remaining fifty-one percent interest.

Despite this agreement, Ehrichs and Kearney never became business partners. The parties differ as to the reasons for their falling out. The district court found that the two met for breakfast at the Perkins restaurant in Fargo a week or two after their forty-nine/fifty-one agreement was reached. Ehrichs expressed misgivings concerning his continued involvement in the manufacturing business since things had gone so bad for Ehrichs Manufacturing in the past. He stated that he did not want any part of the operation if he could not have complete control.

The court further found that Kearney made several efforts to persuade Ehrichs to abide by their forty-nine/fifty-one agreement and Ehrichs' responsibilities thereunder. Several days later, "Ehrichs signed over to Kearney all of his stock in Ehrichs Manufacturing, and Kearney agreed to settle the debts of Ehrichs Manufacturing." *Ehrichs v. Kearney*, Civil No. A3–81–71, slip op. at 6 (D.N.D. April 8, 1983). Kearney proceeded to use his total control of the company to negotiate reduced payments as satisfaction of some of the debts of Ehrichs Manufacturing and to transfer many of the company's assets to other companies which he effectively managed. He has to this date failed to extinguish several debts which appeared on the books of Ehrichs Manufacturing at the time of the stock transfer, including two notes payable to Ehrichs personally and to his deceased mother, Minnie Ehrichs.

On February 5, 1981, Ehrichs instituted this action in the district court for Cass County, North Dakota. Kearney removed the action to federal district court and, on September 8, 1982, Ehrichs filed his first amended complaint, containing the allegations against Kearney which ultimately were tried before the district court. Ehrichs alleged that Kearney was to transfer forty-nine percent of the stock back to Ehrichs pursuant to their original forty-nine/fifty-one agreement after their falling out at the Perkins restaurant. He claimed a right to recover any profits made by Kearney from the disposition of Ehrichs Manufacturing assets under three theories: (1) that Kearney fraudulently entered the forty-nine/fifty-one agreement with no intention of following through, resulting in a rescission of that agreement; (2) that Kearney was responsible to Ehrichs for the surplus created by liquidating the assets of Ehrichs Manufacturing under the Uniform Commercial Code (UCC), N.D.Cent.Code § 41–09–50 (1983); or (3) that Kearney's profits from these transactions amounted to an unjust enrichment. Ehrichs' specific requests for relief were all for monetary recovery and related expenses.

The district court found, first, that Ehrichs' allegations of fraud were unsubstantiated and that the ultimate stock transfer to Kearney "was voluntary and constituted a new agreement between the parties." *Ehrichs v. Kearney, supra,* Civil No. A3–81–71, slip op. at 9. Second, it held that the UCC duty to account for the surplus of assets after foreclosure ran to the debtor, Ehrichs Manufacturing, and not to Ehrichs personally. Finally, it held that Ehrichs could not maintain his action under a theory of unjust enrichment/quasi-contract because North Dakota law allows such recovery only in the absence of an express or implied in fact contract. Ehrichs appeals only from the latter two holdings of the court.

■ The linchpin to this action is the existence and validity of the oral stock transfer agreement between Ehrichs and

Kearney following their Perkins restaurant meeting. The district court found that such an agreement in fact was entered. Based on Ehrichs' own testimony, the depositions of both parties, and the exhibits in the record, we cannot say that this finding was clearly erroneous. *See* Fed.R.Civ.P. 52(a).

Moreover, Ehrichs' contentions on appeal regarding the legal validity of this agreement are unavailing.[1] Even assuming that contracts such as the stock transfer agreement normally must be in writing under the statute of frauds, *see* N.D.Cent. Code § 9–06–04(1), (2) (1975); *but see Nelson v. TMH, Inc.*, 292 N.W.2d 580, 585 (N.D.1980) (where promisor receives direct personal benefit, promise is original and thus outside the statute of frauds), the agreement has been partially performed, with Ehrichs' transfer of stock and Kearney's settling of some of the corporate debts, and thus is not invalid for want of a written memorial. *See Cooke v. Blood Systems, Inc.*, 320 N.W.2d 124, 129 (N.D. 1982); *Vasichek v. Thorsen*, 271 N.W.2d 555, 560–561 (N.D.1978). Furthermore, Kearney's promise to settle the debts of the corporation, in addition to releasing Ehrichs from his obligations under the prior forty-nine/fifty-one contract, was more than sufficient consideration to support the stock transfer agreement. Finally, the district court's dismissal of Ehrichs' fraud claim and the facts in the record belie Ehrichs' claim on appeal that the agreement has been, or should be, rescinded. *See Robertson Companies, Inc. v. Kenner*, 311 N.W.2d 194, 197–198 (N.D.1981); N.D. Cent.Code §§ 9–09–02, 9–09–04 (1975).

Having found a valid agreement in fact transferring all Ehrichs' ownership interest to Kearney, the district court ruled correctly on Ehrichs' claims under the UCC and under the theory of unjust enrichment/quasi-contract. Kearney's UCC duty to account for the surplus of Ehrichs Man-

ufacturing assets after the foreclosure sale ran to the debtor, which was the corporation itself. *See* N.D.Cent.Code § 41–09–50(2) (1983). Once Ehrichs relinquished his ownership interest in the company, he no longer had any right to the surplus of its assets, directly or indirectly. Furthermore, North Dakota law makes clear that the remedy of unjust enrichment/quasi-contract is available only in the absence of an express or implied in fact contract such that alternative remedies are inadequate. *Midland Diesel Service & Engine Co. v. Sivertson*, 307 N.W.2d 555, 557–558 (N.D. 1981).

Thus, the district court was correct in denying Ehrichs any recovery under the theories he pursued below and presses upon us here. The facts relied on to reach that judgment and the record, however, show conclusively that Kearney breached at least part of the stock transfer agreement which was the basis for denying Ehrichs relief on the theories pled. Although Ehrichs did not focus his lawsuit on Kearney's breach of the stock transfer agreement, a court may grant recovery on a theory not pled but fairly tried by both parties. *Charles Schmitt & Co. v. Barrett*, 670 F.2d 802, 806 (8th Cir.1982). *See also* Fed.R.Civ.P. 15(b), 54(c); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219, p. 145 (1969); 6 C. Wright & A. Miller, Federal Practice and Procedure §§ 1493–1494, pp. 460–461, 475 (1971). This abrogation of the "theory of the pleadings" doctrine is likewise applicable on appeal where the resolution of an issue not pled may be made on the record without undue prejudice to any party's right to present evidence and argument on that issue. *Webb v. Hiykel*, 713 F.2d 405, 407–408 (8th Cir.1983); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th Cir.1976). *See also* 6 C. Wright & A. Miller, *supra*, § 1494, pp. 476–477.

---

1. We assume for purposes of this opinion that each of Ehrichs' contentions was sufficiently raised below, although the record is none too clear on this score. We further apply North Dakota substantive law to this action, as did the district court and as the parties implicitly agree to on appeal.

In the instant case, both Ehrichs and Kearney put on evidence and argued as to the effects of their extended transactions, including the facts supporting the district court's finding of the stock transfer agreement and their actions subsequent to it. The court specifically found that Kearney "agreed to settle the debts of Ehrichs Manufacturing," but failed to go on to consider whether Kearney fulfilled that agreement and whether Ehrichs was harmed if in fact Kearney did fail to abide by it.[2] The record leaves no doubt that Kearney's promise to settle the corporate debts of Ehrichs Manufacturing encompassed obligations to Ehrichs personally and to his deceased mother.[3] *See* Ehrichs Manufacturing Company Balance Sheet as of March 31, 1979, Pl.Exh. No. 2, Joint Appendix at 460, 461, 463; Summary of Thomas L. Elliot, CPA, Def. Exh. No. 67, Joint Appendix at 780, 782, 799; Plaintiff's Summary of Chuck Miller's Worksheet, Pl.Exh. No. 92, Joint Appendix at 964; Chuck Miller's Worksheet, Pl.Exh. No. 6, Joint Appendix at 476. Kearney has steadfastly refused to pay, settle, or otherwise discharge these debts. *See* Trial Testimony of Robert Kearney, Tr. at 32 (November 30, 1982), Joint Appendix at 270.

Thus, we cannot escape the conclusion that Kearney breached the stock transfer agreement insofar as the corporate debts to Ehrichs and his deceased mother are concerned. The measure of damages for a breach of contract is "the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented." *Vallejo v. Jamestown College,* 244 N.W.2d 753, 758 (N.D.1976). *See also* N.D.Cent. Code § 32–03–09 (1976). In this case, Ehrichs is entitled to recovery of the corporate debt owed him personally and, as administrator of his mother's estate, of the corporate debt to her.

From the exhibits in the record, it is apparent that the corporate books of Ehrichs Manufacturing showed balances on Ehrichs' and his mother's accounts on April 20, 1979, of $9,292 and $39,332 respectively. Summary of Thomas L. Elliot, CPA, Def.Exh. No. 67, *supra,* Joint Appendix at 782, 799; Plaintiff's Summary of Chuck Miller's Worksheet, Pl.Exh. No. 92, *supra,* Joint Appendix at 988; Chuck Miller's Worksheet, Pl.Exh. No. 6, *supra,* Joint Appendix at 476 (showing total due on the two notes as approximately $50,000). Furthermore, Kearney breached his obligation to settle these accounts at least as of May 21, 1979, when he met with his accountant Robert Brostrom and failed to recognize the debts to Ehrichs and his mother as outstanding liabilities. *See* Robert Brostrom's Notes (May 21, 1979), Pl.Exh. No. 13, Joint Appendix at 497, 498; Trial Testimony of Robert Brostrom, Tr. at 108–109 (November 30, 1982), Joint Appendix at 346–347. We thus find the above amounts to be conclusive as to the measure of damages experienced by Ehrichs, personally and as administrator of his mother's estate,

2. The district court found in a footnote to its memorandum opinion that there was "no evidence presented at trial sufficient for the court to find that Ehrichs Manufacturing was in fact indebted to Ehrichs or his mother, or that other corporate debts, if any, would not be settled from assets which Ehrichs Manufacturing continues to hold." *Ehrichs v. Kearney,* Civil No. A3–81–71, slip op. at 6, n. 5 (D.N.D. April 8, 1983). Our review of the record, including the summary of Kearney's accounting expert, shows that all parties considered debts to Ehrichs and his deceased mother as corporate debts. Kearney's accounting summary included these obligations even though another allegedly disputed debt—to the estate of Ehrichs' former partner Charles Gift—was removed "upon advice of [Kearney's] counsel." *See* Summary of Thomas L. Elliot, CPA, Def.Exh. No. 67, Joint Appendix at 780, 782–783, 799. The district court's finding to the contrary is, therefore, clearly erroneous.

3. Ehrichs also argues that the stock transfer agreement included Kearney's promise to pay $24,800 plus interest to the estate of his former partner Charles Gift. Because the North Dakota Supreme Court decided that the Gift indebtedness was personal to Ehrichs, *Gift v. Ehrichs,* 284 N.W.2d 435, 439 (N.D.1979), and the district court found that Kearney's promise encompassed only corporate debts, we cannot say Kearney's failure to reimburse Ehrichs for paying this debt constituted a breach of the stock transfer agreement.

resulting from Kearney's breach of the stock transfer agreement as of May 21, 1979.

Because the record could only support findings that Kearney breached the stock transfer agreement and that Ehrichs was damaged to the extent just discussed, a remand for further action with regard to liability or damages would unnecessarily prolong this litigation. We therefore remand for entry of judgment in favor of Ehrichs, personally and as administrator of the estate of Minnie Ehrichs, in the amount of $48,624 with legal interest accrued from May 21, 1979, until final judgment.

The amounts collected by Kearney on liquidation and transfer of Ehrichs Manufacturing assets were more than sufficient to meet this obligation, so we need not concern ourselves with whether Kearney should have to reach into his own pocket to satisfy this judgment. Should the remaining assets of the company be insufficient to remedy Ehrichs, that can only be attributed to Kearney's dealings and he will be personally liable for the balance under this judgment.

In sum, we affirm the district court insofar as it held that Kearney is not liable to Ehrichs under the UCC or under the doctrine of unjust enrichment/quasi-contract. We reverse, however, insofar as the court failed to award damages for Kearney's clear breach of the stock transfer agreement. We remand for entry of judgment in favor of Ehrichs, personally and as administrator of the estate of Minnie Ehrichs, in the amount of $48,624, with legal interest accrued from May 21, 1979.

The parties shall bear their own costs.

FAGG, Circuit Judge, dissenting.

The majority concludes that "the district court was correct in denying Ehrichs any recovery under the theories he pursued below and presses upon us here." *Ante* at 1174. Despite its recognition that "Ehrichs did not focus his lawsuit on Kearney's breach of the stock transfer agreement," *id.*, the majority reverses the district court on the basis of this theory that was not fairly pled or tried by both parties in the district court or raised on appeal. Because I see no justification for this result, I dissent.

By treating the breach of contract theory as if it were raised in the pleadings the majority in effect amends Ehrichs' pleadings *sua sponte* to conform to evidence in the record which is relevant to this theory. *See* Fed.R.Civ.P. 15(b); *Mason v. Hunter*, 534 F.2d 822, 825 (8th Cir.1976). Generally, though, this analogy to Rule 15(b) is relied upon to support the judgment of the district court, since "[a]ppellate courts seem unwilling to allow amendments that will result in the reversal or substantial alteration of the judgment." 6 C. Wright & A. Miller, Federal Practice and Procedure § 1494, at 477 (1971). Authority from our own court is consistent with this view:

> The issue now urged was clearly not presented to nor determined by the lower court. This is a court of appellate jurisdiction, and we are without authority, on the record before us, to determine this question, even though the parties consent thereto. It is true that, in certain exceptional circumstances, pleadings may be amended or deemed amended even in the appellate court, to conform to the proof for the purpose of sustaining the judgment, but this will not be allowed where such amendment would bring about the reversal of a judgment otherwise correct.

*United States v. Winkle Terra Cotta, Inc.*, 110 F.2d 919, 922 (8th Cir.1940). This reluctance of appellate courts to reverse a judgment on a new theory is understandable since the district court will not have had an opportunity to exercise its own judgment on the issues. Wright & Miller, *supra*, § 1494, at 477. In my view *Winkle* is still good law notwithstanding the liberality of modern pleading rules.

Even if we are not directly bound by precedent, considerations of fairness nonetheless dictate that we may not reverse on the basis of an alternate theory unless it appears clearly from the record that the issues involved were tried with the express

or implied consent of the parties. *See* Fed. R.Civ.P. 15(b); Wright & Miller, *supra*, § 1494, at 478; *cf. Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir.), *cert. denied*, 454 U.S. 968, 1084, 102 S.Ct. 512, 641, 70 L.Ed.2d 384, 619 (1981); *Armstrong Cork Company v. Lyons*, 366 F.2d 206, 208–09 (8th Cir.1966); *Standard Title Insurance Co. v. Roberts*, 349 F.2d 613, 620–21 (8th Cir.1965). Accordingly, "it cannot be fairly said that there is any implied consent to try an issue where the parties do not squarely recognize it as an issue in the trial." 3 J. Moore, Moore's Federal Practice ¶ 15.13[2], at 15–171—15–172 (1983); *see Dependahl, supra*, 653 F.2d at 1218, *Armstrong, supra*, 366 F.2d at 208–09; *Standard Title, supra*, 349 F.2d at 620–21; Wright & Miller, *supra*, § 1493, at 462. In the present case there was no express consent to try the issue of breach of the stock transfer agreement, so the inquiry pivots on whether such consent was implied.

The presence of evidence in the record which supports the majority's determination that Kearney breached the stock transfer agreement does not in and of itself warrant the conclusion that the issue was tried by consent. Implied consent to try a wholly different theory cannot be inferred merely from the unchallenged introduction of evidence relevant to the new theory when the evidence is also relevant to issues already in the case. *See Dependahl, supra*, 653 F.2d at 1218; *Standard Title, supra*, 349 F.2d at 620; *see also* Moore, *supra*, ¶ 15.13[2] at 15–171—15–172; Wright & Miller, *supra*, § 1493, at 462–67. Evidence which supports the breach of contract theory embraced by the majority is also relevant to Ehrichs' action for an accounting for the surplus of corporate assets. Hence, there is nothing in the record clearly to indicate that the parties recognized that an issue not fairly presented by the pleadings had entered the case by consent at trial.

The unfairness resulting from reliance on a theory not advanced in the district court only compounds the prejudice which flows from the majority's raising an issue on appeal that was not submitted in the briefs. Kearney is thus not only denied the opportunity to present evidence on the new theory, but is in addition precluded from advancing arguments on appeal pertinent to the rationale of the majority's decision. Indeed, the outcome on appeal is beyond the realm of possibilities that Kearney might reasonably have foreseen. Without a minimum assurance of predictability on the part of this court, parties will simply be at a loss to decide what arguments and theories they should pursue on appeal. We should not raise and decide issues on our own motion without ensuring that the parties have had a fair opportunity to present evidence and arguments bearing on the resolution of those issues.