The VICTORIAN HOUSE,
INC., Appellee,

v.

FISHER CAMUTO
CORPORATION, Appellant.

The VICTORIAN HOUSE,
INC., Appellant,

v.

FISHER CAMUTO
CORPORATION, Appellee.

Nos. 84–1955, 84–2066.

United States Court of Appeals,
Eighth Circuit.

Submitted April 8, 1985.

Decided July 18, 1985.

Rehearing Denied Aug. 22, 1985.

Edwin M. Zimmerman, Washington, D.C., for appellant.

Alan C. Kohn, St. Louis, Mo., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Fisher Camuto Corporation (Fisher) appeals from a judgment entered against it in a suit brought by The Victorian House, Inc. (Victorian House) alleging a conspiracy in violation of Section 1 of the Sherman Act. For reversal, Fisher contends that Victorian House failed to present sufficient evidence of a conspiracy and that the district court[1] committed reversible error in the conduct of the trial. Victorian House filed a "protective" cross-appeal alleging error in the district court's failure to grant injunctive relief and its granting of Fisher's motion for a directed verdict on count II of the complaint (alleging breach of contract). We affirm the judgment of the district court and dismiss the cross-appeal.

## I. BACKGROUND.

Fisher imports women's shoes and distributes them to retailers under the brand name "9 West." Fisher distributes the shoes nationwide through twenty-seven salespersons, called "distributors," who are described as independent contractors; they are paid on a commission basis. Prior to the spring of 1983, Fisher's distributors had the authority to sign up new retail sellers. However, in January 1983, Fisher developed a program to license the 9 West brand name to manufacturers of products other than shoes. As part of this program, Fisher decided that it would be necessary

---

**1.** The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri.

to stop distributing 9 West shoes to retailers who conveyed a "discount" or "bargain basement" image.

Fisher's president, Wayne Weaver, announced the new policy to Fisher's distributors at a sales meeting in April 1983. Weaver instructed the distributors to identify any retailers in their territories who might be classified as discounters. He provided certain criteria to be applied in making this determination, including whether the store maintained a "quality image," whether it operated on a self-service basis, and whether it operated in an off-price or bargain value mode.

Victorian House operates three retail clothing stores in St. Louis County, Missouri. It has a policy of selling well-known fashion lines of clothing at prices below those of its competitors. Prices are set by actual comparison with other stores' prices and by applying a markup rate approximately forty percent below that used by other retailers. Victorian House advertises its lower prices and places a "comparison price" on the price tags for its merchandise.

In late 1981, Victorian House decided to begin selling women's dress shoes. It researched the market and decided that it would sell the 9 West brand exclusively. A.W. Baum, the owner of Victorian House, met with Fisher's St. Louis distributor, David Thomas, in March 1982 and placed an order for 9 West shoes. At that meeting, Baum informed Thomas that Victorian House was a "super value" store and Thomas stated that he liked Victorian House's selection and prices.

Thomas is Fisher's distributor for the States of Missouri, Nebraska, and Kansas. In addition to working for Fisher, he also operates three retail shoe stores, two of which sold 9 West shoes in the same market as Victorian House. Fisher knew of Thomas's activities as a retailer when it hired him as a distributor. Thomas attended the April 1983 sales meeting at which Fisher announced its new policy regarding

discounters. As directed, he prepared a list of his retail customers that did not meet Fisher's "fashion image" criteria. Thomas listed three retailers in his territory: Wilkerson's, TOPS, and Victorian House. Of these three, Wilkerson's was a national chain that did not sell 9 West in the St. Louis market and TOPS did not buy 9 West from Fisher but obtained them from other sources.[2]

Thomas testified that he considered Victorian House a "close call" because it did not satisfy all of the criteria established by Fisher. In particular, he admitted that Victorian House did maintain a quality image and that it was not a self-service store. However, he felt that its pricing policy, in which everything in the store was offered "off-price," satisfied the third criteria, so he placed it on his list. Thomas testified that, because of his doubts about terminating Victorian House, he called Wayne Weaver to confirm the decision. Weaver came to St. Louis and inspected Victorian House for himself. After the inspection, Weaver told Thomas he had made the "right decision" about termination. Approximately one month later, Fisher sent a form letter to Victorian House and over 200 other retailers, informing them that, under Fisher's new marketing policy, they would no longer be able to purchase 9 West shoes.

## II. DISCUSSION.

### A. Sufficiency of the Evidence.

Victorian House sought to prove that Fisher conspired with one or more of its retailers in the St. Louis area to terminate Victorian House for the purpose of restraining price competition. Fisher argues on appeal that the evidence was insufficient to establish an illegal conspiracy in two respects: first, Victorian House failed to prove the existence of an agreement between Fisher and any other entity; second, there was no evidence that the alleged co-conspirators shared a common purpose in violation of the law.

Fisher argues that it acted independently in terminating Victorian House.

---

**2.** There was evidence in the record that some retailers would purchase an oversupply of shoes

from Fisher and then resell them to other retailers.

Independent action is not proscribed by Section 1 of the Sherman Act. *Monsanto Corp. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Victorian House contends that Fisher conspired with at least one retailer, namely, David Thomas. A conspiracy between a wholesaler and one or more of its retailers to terminate a competing retailer on the basis of price constitutes a *per se* violation of the Sherman Act. *Cernuto Corp. v. United Cabinet Corp.*, 595 F.2d 164, 170 (3d Cir.1979). *See Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235, 1237 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984) and *Battle v. Watson*, 712 F.2d 1238, 1240 (8th Cir.1983) (McMillian, J., dissenting), *cert. denied,* — U.S. —, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984).[3]

■ Fisher admits that David Thomas participated in the decision to terminate Victorian House. Fisher argued at trial, however, that Thomas participated as Fisher's agent, not as a retailer in competition with Victorian House. We have held that a corporation cannot engage in an antitrust conspiracy with its agent unless, at the time of the conspiracy, the agent is acting for his own benefit. *Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1156–57 (8th Cir.1982); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 917 (8th Cir.1976). Thus, we must determine whether Victorian House presented sufficient evidence that Thomas was acting in furtherance of his personal interests when he recommended termination.

The record indicates that in November 1982, prior to the announcement of Fisher's new marketing policy, Thomas informed Tammy Breeden, a buyer and manager for Victorian House, that he was "getting a lot of heat" about the way Victorian House priced some of its shoes. Thomas threatened to terminate Victorian House or delay its shipments if it did not raise all of its prices to at least twenty percent less than the suggested retail price. This evidence suggests that Thomas had a motive for the termination separate from Fisher's marketing policy, and supports the conclusion that he acted not as Fisher's agent but in furtherance of his personal interests.

In addition, the question of whether Victorian House actually met the termination criteria set by Fisher was sharply contested at the trial. Victorian House presented evidence of its "quality" and "fashion" image, that it did not operate on a self-service basis, and that it would not be regarded by other retailers as a "discounter". The jury could have concluded from this evidence that Thomas just used Fisher's new policy as a pretext for getting rid of Victorian House in order to eliminate price competition.

Finally, Thomas was a retailer in the St. Louis market at the time he recommended the termination. His stores were losing money at the time and he acknowledged his expectation that other 9 West retailers would benefit from the elimination of Victorian House as a competitor. We are satisfied that the above evidence, considered in the light most favorable to the jury's verdict, is sufficient to support the conclusion that Thomas was acting for his own benefit at the time he recommended Victorian House for termination.

Fisher also argues that no conspiracy occurred in this case because it did not share a common purpose with Thomas. Assuming for the sake of argument that Thomas did act in order to eliminate Victorian House as a competitor, Fisher contends that it did not share Thomas' purpose, but instead acted solely to protect the value of its trademark.

As discussed above, the jury could have found that Victorian House did not actually meet the termination criteria established by Fisher. Fisher must have been aware of this fact because its president, Wayne Weaver, inspected Victorian House prior to the termination. The jury could have concluded from this evidence that Thomas secured Fisher's cooperation in a plan to re-

---

**3.** In both *Roesch* and *Battle,* an equally divided court affirmed the district court's judgment.

The various opinions in those cases support the above definition of a *per se* violation.

duce price competition by terminating Victorian House. Accordingly, we also reject Fisher's second challenge to the sufficiency of the evidence and we conclude that the record contains sufficient evidence to sustain the jury's finding of an unlawful conspiracy.

### B. Trial Errors.

#### 1. The instruction on liability.

■ The court gave the following instruction on liability:

Your verdict must be for plaintiff if you believe:

First, defendant combined or conspired with one or more retailers in competition with plaintiff to refuse to deal in 9 West shoes with plaintiff for *price-related* reasons; and

Second, the combination or conspiracy affected interstate trade or commerce; and

Third, defendant's activities proximately caused damage to the plaintiff's business and property.

(Emphasis added). Fisher argues that an antitrust violation can only be premised on a conspiracy to *fix* prices. It claims that the instruction was inadequate because it permitted a finding of violation on the basis of a *price-related* conspiracy.

"When considering a challenge to jury instructions, the 'general rule is that the instructions must be read as a whole and considered in light of the entire charge.'" *Tribble v. Westinghouse Electric Corp.*, 669 F.2d 1193, 1197 (8th Cir.1982) (quoting *King v. State Farm Life Insurance Co.*, 448 F.2d 597, 600 (8th Cir.1971)). We think the jury instructions in this case, when read as a whole, accurately state the elements of a Sherman Act violation. Immediately preceding the instruction in question, the court gave the following instructions:

The basic purpose of the anti-trust laws is to protect, encourage, and foster free and unfettered competition as the rule of trade for the American economy.

\*　　\*　　\*　　\*　　\*　　\*

[T]he laws are intended to prevent exclusionary or anti-competitive conduct which serves to raise prices, restrict production, or interfere with the market to the detriment of purchasers and consumers.

These instructions complement the instruction on liability and correct any misimpression that may have been conveyed by that instruction alone.

#### 2. The court's response to the jury's question.

■ After four hours of deliberation, the jury gave a note to the bailiff which read: "We need a clarification on the antitrust law. Does there have to be a conspiracy before it is antitrust?" The judge decided not to reread any of the instructions and told the bailiff to inform the jurors that they must recall the oral instructions "as best they can". Fisher contends that the jury's question addressed "the most basic" of all Sherman Act issues, and that the court had a duty to reinstruct the jury.

We have already concluded that the instructions given properly informed the jury of the applicable law. Furthermore, we note that Fisher did not object at the trial to the district court's decision not to reinstruct, despite a specific invitation to do so. "The necessity, extent and character of additional instructions to the jury is a matter within the trial court's discretion." *Thezan v. Maritime Overseas Corp.*, 708 F.2d 175, 182 (5th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). We conclude that the court did not abuse its discretion by failing to give additional instructions to the jury.

#### 3. The damage verdict.

Finally, Fisher contends that the jury's verdict on damages was not supported by sufficient evidence. We have carefully reviewed the record and we are satisfied that Victorian House presented sufficient evidence to support the verdict.

### C. Victorian House's Cross-Appeal.

Victorian House characterizes its cross-appeal as "protective" only and expressly assents to its dismissal if the district court's damage award is affirmed. Be-

cause we have rejected Fisher's arguments for reversal, we dismiss the cross-appeal.

## III. CONCLUSION.

The judgment of the district court is affirmed. Appellant's cross-appeal is dismissed.

FAGG, Circuit Judge, dissenting.

In my view, Victorian House failed to present sufficient evidence of a conspiracy. The evidence presented by Victorian House does not "tend[ ] to exclude the possibility of independent action by [Fisher]" as it must under *Monsanto Corp. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). To the contrary, it is clear under the evidence that Fisher's president, acting independently of sales representative Thomas, made his own determination that Victorian House met Fisher's termination criteria. The evidence in this case does not "reasonably tend[ ] to prove that [Fisher] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* I would thus reverse the judgment of the district court.