**LOMAR WHOLESALE GROCERY, INC., an Iowa Corporation, Appellant,**

v.

**DIETER'S GOURMET FOODS, INC., A California Corporation; Gourmet Foods, Inc., A Minnesota Corporation; and Art Stone, President of Gourmet Foods, Inc., Appellees.**

No. 86–1167.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1986.

Decided July 13, 1987.

Rehearing and Rehearing En Banc Denied Aug. 13, 1987.

Donald J. Polden, Des Moines, Iowa, for appellant.

Thomas J. Rooney, St. Paul, Minn., for appellees.

Before BOWMAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and CONMY,* District Judge.

BOWMAN, Circuit Judge.

Lomar Wholesale Grocery, Inc. (Lomar) appeals from two orders of the District Court granting summary judgment in favor of defendants Dieter's Gourmet Foods, Inc. (Dieter's), Gourmet Foods, Inc. (GF) and GF's president, Art Stone. Lomar brought suit against defendants, seeking damages and injunctive relief for alleged violations of both Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Robinson-Patman Act, 15 U.S.C. § 13. Lomar charges GF and Stone (hereafter referred to collectively as GF) with conspiring to engage in a group boycott to deny Lomar access to the products of three different grocery suppliers. The complaint also charges GF with engaging in a vertical price-fixing conspiracy in which the suppliers terminated Lomar as a distributor in an effort to protect GF from price competition. Finally, Lomar charges GF with engaging in price-discrimination and with receiving illegal brokerage in violation of sections 2(a) and 2(c), respectively, of the Robinson-Patman Act. Defendants filed motions for summary judgment as to each of Lomar's Sherman Act claims, and, after a hearing, the District Court entered an order granting the motions. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 627 F.Supp. 105 (S.D.Iowa 1985) (*Lomar I*). Following additional briefing and argument, the District Court entered an order granting defendants' motions for summary judgment on the Robinson-Patman claims. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 627 F.Supp. 117 (S.D.Iowa 1985) (*Lomar II*). We affirm each of the orders in all respects.

## I.

Lomar and GF are wholesale distributors of specialty food products, selling ethnic, seasonal, dietetic, and other low volume items to retail grocery outlets. Other specialty food distributors and general grocery wholesalers compete with the two firms for sales of the same products, but the effectiveness of this competition is the subject of sharp dispute. Lomar contends that specialty foods distribution forms a separate product submarket in which Lomar and GF are the only significant players. GF urges a broader product market definition that would include many more competitors and encompass a variety of comparable products sold by general grocery wholesalers. There is at least some agreement that the state of Iowa and certain contiguous areas comprise the relevant geographic market.

Lomar's complaint stems from its inability to purchase and distribute the products of Dieter's Gourmet Foods, Inc. (Dieter's), Chicago Dietetic Supply, Inc. (Chicago Dietetic) and Celestial Seasonings, Inc. (Celestial). Lomar charges that in an effort to eliminate its competition in the Iowa market, GF entered into a conspiracy with each of these suppliers to foreclose Lomar's access to their products. There is no allegation that the three suppliers conspired among themselves, or that any of the suppliers solicited another's participation in the alleged conspiracy. Rather, Lomar alleges that GF used its substantial national market power as the largest specialty food distributor in the country to coerce each of the suppliers separately into the alleged antitrust violations aimed at Lomar.

The District Court first found that Lomar's Sherman Act claims involving Chicago Dietetic were time-barred. *Lomar I*, 627 F.Supp. at 109. The court then found that Lomar had failed to present evidence raising genuine issues of material fact in support of its other claims under the Sherman Act.[1] *Id.* at 116. In disposing of the

* The HONORABLE PATRICK A. CONMY, Chief Judge for the District of North Dakota, sitting by designation.

1. By stipulation, the parties agreed to try the Sherman Act claims solely on a *per se* theory. Accordingly, Lomar must show that as a matter of law it has alleged one or more Sherman Act violations falling within the narrow *per se* category, and that there are disputes of fact material to the resolution of its claims under the *per se* rule. Absent such a showing, summary judgment was appropriate, regardless of any disputed issues of fact that would be relevant to

Robinson-Patman claims, the District Court held that Lomar had failed to make a sufficient showing of competitive injury from the alleged price discrimination under section 2(a), or of individual injury from the alleged brokerage payments under section 2(c). *Lomar II,* 627 F.Supp. at 119, 120.

## II.

While we generally use summary judgment "sparingly" in anti-trust litigation, *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 317 (8th Cir.1986) (quoting *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d· 458 (1962)), summary procedures are appropriate where the issues for resolution are primarily legal rather than factual. In reviewing the District Court's grant of summary judgment in favor of defendants, we apply the same standard as that applied by the District Court. *Kegel v. Runnels,* 793 F.2d 924, 926 (8th Cir.1986). Accordingly, we must determine whether there are any genuine issues of material fact which would entitle Lomar to a trial of its claims. Fed.R.Civ.P. 56(c). In making this determination, we "view the facts and all reasonable inferences derived therefrom in the light most favorable to the nonmoving party." *Green v. United States Dept. of Labor,* 775 F.2d 964, 973 (8th Cir.1985). Rule 56 does not require us to submit for trial all those claims about which the parties have some factual dispute. Issues of fact must be *material* to a resolution of the dispute between the parties; where the only disputed issues of fact are immaterial to the resolution of the legal issues, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We note that defendants here have supported their motions with "pleadings, depositions, answers to interrogatories ... admissions [and] affidavits" as provided in Rule 56(c). Lomar, which bears the burden of proving its antitrust claims at trial, therefore may not rest merely on the conclusory allegations contained in its plead-

ings and legal memoranda. Rather, by affidavits or otherwise, it must point to specific evidence showing that there are *genuine* disputes of material fact that must be resolved before its claims can be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). With these considerations in mind, we review the record with respect to each of Lomar's claims.

*Statute of Limitations: Chicago Dietetic Products*

Lomar filed this suit against GF on August 30, 1979. In August 1981, Lomar amended its complaint and for the first time alleged a conspiracy between GF and Chicago Dietetic. The amended complaint alleged Sherman Act violations in connection with Chicago's termination of Lomar as a distributor of its Featherweight line of products on March 5, 1976, and with Lomar's subsequent inability to purchase the products between 1976 and 1980. Defendants moved for summary judgment on the Chicago Dietetic claims, arguing that claims based on the 1976 termination were time-barred by the four-year statute of limitations on private actions contained in 15 U.S.C. § 15(b).

In granting the motions, the District Court rejected Lomar's argument that the amendment related back, under Fed.R. Civ.P. 15(c), to the filing of the first complaint. *Lomar I,* 627 F.Supp. at 107–08. The court also rejected Lomar's alternative argument that the new claims were not time-barred because they alleged a "continuing conspiracy" under *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). *Lomar I,* 627 F.Supp. at 108–09. On appeal, Lomar has dropped its Rule 15(c) argument, and we do not address it here. Lomar continues to argue, however, that Chicago Dietetic's refusal to deal with Lomar between 1976 and 1980 involved acts in furtherance of a continuing conspiracy occurring during the statutory period. We disagree and hold that the District Court

claims properly evaluated under the rule of reason. *Cf. McCabe's v. La–Z–Boy Chair Co.,* 798

F.2d 323, 329 (8th Cir.1986), *petition for cert. filed,* 55 U.S.L.W. 3495 (Dec. 29, 1986).

did not err in ruling that Lomar's claims against Chicago Dietetic are time-barred.

■ In *Zenith Radio*, the Supreme Court held that a continuing conspiracy may extend the statutory period on private antitrust actions, because a cause of action arises each time the plaintiff is injured by an overt act of the defendant in furtherance of the unlawful conspiracy. 401 U.S. at 338, 91 S.Ct. at 806. In *Pioneer Co. v. Talon, Inc.*, 462 F.2d 1106 (8th Cir.1972), we held that in the context of a refusal to deal, a supplier's rejection of a specific order placed by a boycotted distributor constitutes an overt act within the meaning of *Zenith Radio*, at least where the distributor has no specific distributorship contract which the supplier finally and unequivocably has terminated. The distributor in *Pioneer* had no such contract, and even though the supplier had informed the distributor of its "termination" more than four years before the action was filed, we held that the supplier's subsequent refusals to accept specific orders placed within the statutory period "caused new injury to [the distributor] each time an order was refused." 462 F.2d at 1109. *Compare David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 937 (9th Cir.) (subsequent refusals to deal, even within the statutory period, are not overt acts giving rise to new causes of action where plaintiff's requests are merely "forlorn inquiries by one all of whose reasonable hopes had been previously dashed"), *cert. denied*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); *see also In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir.) (initial refusal to deal was "irrevocable, immutable, permanent and final"), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). *But see Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1300–01 (9th Cir. 1986) (payments by souvenir vendors to tour operators and operators' shepherding of tourists away from plaintiff's competing souvenir shop constitute "overt acts"), *cert. denied*, —— U.S. ——, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986).

In 1978 and 1979, employees of Remco, Ltd., a broker for Chicago Dietetic, requested that Chicago Dietetic reinstate Lomar as a distributor of Chicago Dietetic's products. Lomar alleges that the brokers made the requests "[o]n Lomar's behalf and for the benefit of Lomar," Brief of Appellant at 39, and that Lomar's president knew and approved of the requests. Reply Brief of Appellant at 16. Lomar argues that the brokers' inquiries were tantamount to Lomar's placing specific orders and that Chicago Dietetic's unfavorable responses to the requests "were either continuing effects of the earlier termination or fresh instances of a Gourmet-inspired refusal to deal." Brief of Appellant at 39–40. In an appropriate case, the distinction between "continuing effects" and "fresh instances" could be critical. The former are "merely the abatable but unabated inertial consequences of some pre-limitations" conduct, and they do not give rise to new causes of action. *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 128 (5th Cir.1975) ("It remains clear ... that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period."), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976) and 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). In contrast, "fresh instances" suggest new refusals to fill specific orders, which would bring the conduct within our holding in *Pioneer*, and compel a similar result here.

In this case the distinction is without significance, because we agree with the District Court that the inquiries made by the Remco brokers do not constitute specific orders for goods by Lomar. Lomar admitted that it did not place any orders for, or otherwise attempt to obtain, Chicago Dietetic products during the statutory period. I Joint Appendix of Record Excerpts (App.) at 157–58. Moreover, nothing in the record suggests that Lomar requested the two Remco brokers to make the inquiries on Lomar's behalf. The joint affidavit of the two Remco brokers merely asserts that the brokers "put pressure" on Chicago Dietetic to sell to Lomar during 1978 and 1979 as a means of increasing sales of Chicago Dietetic products, Addendum to

Brief of Appellant at 53, and notes that Lomar "was aware" of the initially unsuccessful efforts.[2] *Id.* at 54. Such general inquiries initiated by third parties, even if congruent with Lomar's own interests, do not constitute specific orders for goods and do not give rise to an overt act of refusal that causes Lomar a separately actionable antitrust injury. In addition, the brokers' affidavit suggests that Chicago Dietetic's reaction to the inquiries was merely the residual effect of the earlier refusal to deal. The Chicago Dietetic representative contacted by the brokers "declined to push the matter with his superiors," apparently believing that they "would not go along with such a proposal because Lomar had caused them problems at an earlier time when Lomar had not stayed within certain territorial sales boundaries as set forth by Chicago Dietetic." *Id.* at 53.

The situation here resembles that in *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74 (6th Cir.1981). In *Barnosky*, the Sixth Circuit upheld the dismissal of a Sherman Act price-fixing claim brought by an oil jobber who resold to individual retailers gasoline purchased from the defendant. The complaint alleged that Union Oil illegally had coerced Barnosky into terminating gasoline sales to a price-cutting retailer. The court held that an action brought in 1977 was time-barred as to the 1971 agreement to terminate the retailer, even though "Union continually enforced the 1971 agreement." *Id.* at 81. Observing that Barnosky never requested permission to sell gasoline to the terminated retailer during the limitations period, *id.*, the court concluded that "Barnosky may have suffered, and Union may have benefitted, from the consequences of Union's conduct during the limitations period [but this] does not render the act a continuing violation of the antitrust laws." *Id.* at 82. Here, Lomar made no additional demand upon Chicago Dietetic which might give rise to a new injury. Rather, "the injury, if any, experienced by Lomar is part of the continuing injury that was caused by its termi-

nation as a distributor." *Lomar I*, 627 F.Supp. at 116.

■ In the alternative, Lomar argues that actually submitting orders for Chicago Dietetic products would have been futile. Relying on *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 377 F.2d 776, 781 (3d Cir.1967), *aff'd in relevant part, rev'd in part on other grounds*, 392 U.S. 481, 487 n. 5, 88 S.Ct. 2224, 2228 n. 5, 20 L.Ed.2d 1231 (1968), Lomar contends that the futile orders need not have been made to establish the requisite continuing acts under *Zenith Radio*. This argument is without merit because it confuses the evidence necessary to establish the plaintiff's standing to bring an antitrust action with the evidence necessary to show that within the statutory period the plaintiff was injured by an overt act in furtherance of a continuing conspiracy. The former involves a showing of antitrust injury, without regard to the time of its occurrence, while the latter involves a showing that the plaintiff suffered injury within the four-year period preceding the filing of its claim.

In *Hanover Shoe*, the Third Circuit noted that "it would be ironic as well as idle to require the victim of the monopoly to make an explicit demand the denial of which was implicit in the continuance of the monopoly." 377 F.2d at 781. Because Hanover was a " 'captive customer' " of United, and "was well aware of United's power as the supplier of machinery and of its policy against sales," the Third Circuit held that a futile demand by Hanover was not necessary to establish that Hanover was coerced into accepting shoe manufacturing machines under a "lease-only" policy, when it would have preferred to buy the machines outright. *Id.; see also Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 743 (9th Cir. 1984) (futile demand not necessary to establish injury, and hence standing, on boycott claim.) The *Hanover Shoe* futility doctrine, however, does not relieve a plaintiff of the burden of showing that a specific act of the defendant caused injury to the plaintiff within the statutory period. "It is

2. Lomar was reinstated as a Chicago Dietetic distributor in 1980.

not sufficient that the plaintiff may have suffered damages caused by the defendant's violation within the limitation period;" *Zenith Radio* requires "an overt act in furtherance of an antitrust conspiracy ... which is committed within the limitations period." *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir.1986).

The Third Circuit addressed the statute of limitations question in a separate portion of the *Hanover Shoe* opinion.[3] There, the court rejected United Shoe's contention that Hanover could not recover for a refusal to deal occurring outside the limitations period, "even for damages following the reiteration of such a refusal to deal within the statutory period." 377 F.2d at 794 (Supplemental Opinion). The court noted that United had gone beyond a mere continuation of the "lease-only" policy. By collecting payments from the coerced lessees and by entering into new leases as equipment needed to be replaced, United had committed separate acts in furtherance of its illegal policy within the statutory period. *Id.* at 794. As the court observed, "where the repeated and measureable invasion of a plaintiff's rights occurs both outside the statutory period and also within it, the fact that some of the injury and damage occurred outside the statutory period does not affect the plaintiff's right to recover for *the separate invasion of its rights which occurred within the period.*" *Id.* at 795 (emphasis added). We do not find in this language any support for Lomar's argument.

The law does not require Lomar to make a futile demand of Chicago Dietetic to demonstrate that Lomar was injured by the supplier's refusal to deal. However, this does not relieve Lomar of its burden, in alleging a continuing conspiracy, of showing that it "was injured by an act of the defendants occurring within the statutory period." *Zenith Radio*, 401 U.S. at 338, 91 S.Ct. at 806. Here, Lomar has shown no overt act constituting a separate invasion

of its rights during the four years prior to the filing of this action. Whatever injury it suffered flowed from its 1976 termination by Chicago Dietetic, and this portion of its complaint is now time-barred. Accordingly, we hold that the District Court did not err in granting GF's motion for summary judgment with respect to Lomar's claims involving Chicago Dietetic.

*Vertical Price Fixing*

■ After an unsuccessful attempt in 1975 to purchase grocery products directly from Dieter's, Lomar had been purchasing the products from M & JR Hakes, Inc. (Hakes), a general grocery warehouse concern. Hakes' own source of the Dieter's products had been GF, but upon discovering the resales to Lomar in 1976, GF unilaterally terminated its sales of the products to Hakes. Between 1976 and 1979, Lomar purchased Dieter's products through another food distributor, but in March 1979 that distributor was acquired by another competitor of Lomar's, which also then refused to sell Dieter's products to Lomar. In early 1979, Lomar again submitted an order directly to Dieter's. After consultation with GF, Dieter's responded to the order by informing Lomar that a market survey would be conducted to study the need for an additional distributor of Dieter's products in the area and that Lomar's order would be held for six months pending the outcome of the survey. Lomar filed this lawsuit before the end of that six-month period, alleging that Dieter's refusal to sell to Lomar was related to Lomar's price-cutting, and was the product of a conspiracy between GF and Dieter's to protect GF from price competition.

Lomar alleges that Dieter's response to its 1979 order was pretextual. According to Lomar, Dieter's already had agreed at GF's insistence to refuse to deal with Lomar. Based on the evidence submitted in support of this claim, the District Court concluded:

**3.** Although the present statute of limitations contained in 15 U.S.C. § 15(b) did not apply to the action in *Hanover,* the court's disposition of United Shoe's arguments with respect to the issue is instructive. If the futility of Hanover's

demand during the statutory period were a complete answer to both the standing and the statute of limitations questions, the court's separate discussion of the latter would not have been necessary.

The Court can find that GF had the power to veto applications by other distributors to obtain a distributorship in its territory, can find that the market study was a pretext designed to camouflage the decision which had already been made by GF and Dieter's to refuse to deal with Lomar, can find that GF was a powerful force in the market, can find that GF did not have an "exclusive distributorship" with Dieter's, and can find that GF raised its prices after Lomar was unable to buy Dieter's products. Yet none of these facts give rise to the inference that there was a price-fixing conspiracy between GF and Dieter's.

*Lomar I*, 627 F.Supp. at 115. On appeal, Lomar argues that the District Court ignored evidence that GF was extremely concerned about Lomar's price cutting. According to Lomar, evidence of this concern, in combination with the other evidence referred to by the District Court in the above-quoted language, establishes a triable case of vertical price fixing.

We agree with the District Court that Lomar failed to produce evidence from which it reasonably could be inferred that "GF and Dieter's took concerted action with the *common purpose to fix prices.*" *Id.* As observed by the court below, *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), specifically rejected the argument that a price fixing agreement can be "inferred merely from complaints by distributors to the manufacturer about price-cutting distributors and the fact that termination came about in response to such complaints." *Lomar I*, 627 F.Supp. at 115. As this Court has observed, *Monsanto* means that "for a terminated dealer to prevail on its per se [price fixing] claim, the evidence must be sufficient for the jury to determine not merely that the manufacturer and nonterminated dealer conspired," but that the conspiracy was price-related. *McCabe's Furniture, Inc. v. La–Z–Boy Chair Co.*, 798 F.2d 323, 329 (8th Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3495 (Dec. 29, 1986).

Lomar has pointed to nothing in the record even remotely suggesting that Diet-er's shared GF's alleged price concerns. Instead, Lomar refers us to *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466 (8th Cir.1985), and attempts to revive the standard rejected in *Monsanto.* In *Victorian House*, we applied a *per se* rule to an apparel retailer's claim that its termination as a distributor of the defendant's line of shoes was the result of a price-related conspiracy between the defendant and the defendant's distribution agent (who was also a competing retailer). There, the defendant had announced a new policy of refusing to deal with retailers who conveyed a "bargain basement" or "discount" image. *Id.* at 467–68. The distribution agent had recommended the plaintiff's termination under this policy, and following its own inspection of the plaintiff's store, the defendant complied. *Id.* at 468. The evidence also showed that the distribution agent previously had complained to the defendant about the plaintiff's pricing and had threatened to terminate the plaintiff if it did not raise its prices. *Id.* at 469. Based on this evidence, we held that the jury reasonably could have concluded that the distribution agent was acting in pursuit of his own interest as a competitor of the plaintiff, and that the plaintiff "did not actually meet the termination criteria" established under the new marketing policy. *Id.* Moreover, we found that the jury also could have concluded that the distribution agent had secured the defendant's cooperation in a plan to reduce price competition by terminating the plaintiff. *Id.* at 469–70.

Lomar argues that the six-month market study proposed by Dieter's here was pretextual, and that GF already had secured Dieter's cooperation in the plan to terminate Lomar for price reasons. According to Lomar's reading of *Victorian House*, evidence that GF was concerned about price competition and that Dieter's consulted GF before responding to Lomar's 1979 order supports the inference that the two firms were engaged in an illegal conspiracy to stabilize prices.

We distinguish *Victorian House* from the undisputed material evidence here. In *Victorian House*, the supplier's new mar-

keting policy explicitly included a focus on its retailers' pricing policies, and was intended to curb distribution of its product through discounting retailers. The significance of the supplier's own concern with retail pricing was illustrated further by the timing of the plaintiff's termination. The termination followed the supplier's inspection of the plaintiff's premises, where the supplier saw firsthand that the plaintiff met only the discounted pricing element of its various "termination criteria." *Id.* at 468. These additional factors made plausible the jury's conclusion that the supplier and competing retailer had a *common* commitment to stabilize the price of goods sold by retailers. *Id.* at 469. Here, there is no such evidence of Dieter's concern with Lomar's prices. Lomar merely asserts that GF's own price concerns should be imputed to Dieter's. We do not believe it appropriate to impute such motives to Dieter's, absent a sufficient demonstration of its own concern with Lomar's pricing. Indeed, the evidence of Dieter's motives is even less persuasive than the evidence presented in *McCabe's,* where a variety of factors, including price, were shown to have motivated the supplier to terminate the plaintiff. 798 F.2d at 330. However, the evidence of the supplier's price concerns in *McCabe's* still did not " 'tend[] to exclude the possibility that the manufacturer and nonterminated dealer' were motivated by nonprice concerns," and we therefore held that the evidence of vertical price fixing was insufficient to submit to a jury on a *per se* rule. *Id.,* (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470). Here, there is no evidence whatsoever of Dieter's motives. In these circumstances, both *Monsanto* and *McCabe's* prohibit application of the *per se* rule. Therefore, we hold that the District Court did not err in granting summary judgment against Lomar on its vertical price-fixing claim.

*Group Boycott*

■ Lomar bases its group boycott claim on essentially the same facts alleged in support of its price-fixing claim. Lomar's counsel conceded at oral argument that for purposes of defendants' summary judgment motion, the factual issues pertaining to the boycott claim are not seriously in dispute. However, unlike a vertical restraint, a group boycott, if it exists, will be subject to *per se* analysis without regard to the presence or absence of a price-related motive. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985). Lomar has not alleged that the suppliers contracted, combined, or conspired among themselves, but rather that GF separately coerced each of the suppliers into boycotting Lomar. The District Court accordingly characterized the alleged group boycott as "a rimless, spoked wheel, with GF and Art Stone as the hub and each of the three manufacturers as a spoke." *Lomar I,* 627 F.Supp. at 111. Hence, the sole issue for our resolution on this claim is a legal one— whether a distributor's separate conspiracies with several suppliers to deny a competing distributor access to the suppliers' products constitutes a group boycott.

■ Lomar argues that the application of the *per se* rule in *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), compels a similar result in this case. We disagree, and hold that refusals to deal involving no concerted action between horizontal competitors do not constitute *per se* unlawful group boycotts. Rather, the refusals should be treated as vertical restraints, and will be subject to rule-of-reason analysis unless the refusals are price-related, *cf. Monsanto,* or are designed to enforce underlying restrictions that would otherwise be subject to *per se* analysis, *see, e.g, Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 9–11, 104 S.Ct. 1551, 1556–58, 80 L.Ed.2d 2 (1984) (certain tying arrangements).

Our analysis of Lomar's group boycott claim begins with the conduct found unlawful in *Klor's.* There, the Supreme Court applied the *per se* rule to a small retailer's group boycott claim which alleged a conspiracy between a number of major appliance manufacturers and Broadway-Hale, a competing retailer. The complaint alleged that the manufacturers had "conspired

*among themselves* and with Broadway-Hale either not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms." 359 U.S. at 209, 79 S.Ct. at 708 (emphasis added). The Court observed that the allegations disclosed a classic group boycott, long held forbidden by the antitrust laws. *Id.* at 212, 79 S.Ct. at 709. However, the Court specifically distinguished the group boycott in that case from an exclusive distributorship, noting that the plaintiff's complaint alleged "a wide combination consisting of manufacturers, distributors and a retailer." *Id.* at 213, 79 S.Ct. at 710.

Despite this language in *Klor's,* Lomar argues that the plaintiff there alleged a conspiracy involving a single competitor organizing a conspiracy with several suppliers. According to Lomar, the briefs of the parties in *Klor's* demonstrate that "the theory of Klor's case was that Broadway-Hale used its buying power to obtain agreements from each manufacturer to cease dealing with Klor's," and that, like Lomar, Klor's did not allege a horizontal conspiracy among the various manufacturers. Reply Brief of Appellant at 13. We question the validity of interpreting the clear language of the *Klor's* opinion by reference to the litigants' briefs. However, we note that the plaintiff in *Klor's* specifically alleged "a conspiracy between all the respondents," Brief of Petitioner at 30, *Klor's,* that was the result of their "contracting, combining, conspiring together, and each with the other." *Id.* at 7. The same brief noted further that the public injury alleged in Klor's complaint was "the entry into this conspiracy *by otherwise competitive firms* ...." *Id.* at 30 (emphasis added). This language reinforces the distinction drawn by the District Court in refusing to apply *Klor's* to the present case. As the court observed, "[i]n *Klor's,* there was an obvious horizontal character to the conspiracy.... In the present case, the combinations are only vertical in character." *Lomar I,* 627 F.Supp. at 113. We therefore decline to read *Klor's* as requiring application of the *per se* rule to the present case.

Because *Klor's* does not govern our analysis, we must look elsewhere for guidance in deciding whether the *per se* rule should apply to Lomar's boycott claim. The Supreme Court has instructed us to apply the *per se* rule to a business practice only when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). The Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers,* 472 U.S. at 290, 105 S.Ct. at 2617 (citing cases). However, the Court also has held that "[t]he mere allegation of a concerted refusal to deal does not suffice [to invoke the *per se* rule] because not all concerted refusals to deal are predominantly anticompetitive." *Id.* at 298, 105 S.Ct. at 2621. Moreover, we have been instructed not to expand indiscriminately the category of restraints classified as group boycotts. *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

The application of these standards in the lower courts has not been a model of consistency. However, our review of the boycott cases convinces us that before we may conclude that refusals to deal are "likely to have predominantly anticompetitive effects," *Northwest Wholesale Stationers,* 472 U.S. at 298, 105 S.Ct. at 2621, there must be some collusion between competitors on the same market level. Absent this element of horizontal collusion, we do not believe the net economic impact of refusals to deal are "immediately obvious," *Indiana Federation of Dentists,* 106 S. Ct. at 2018, and we therefore believe it inappropriate to classify the refusals to deal that Lomar has alleged as a group boycott subject to a rule of *per se* illegality.[4]

**4.** As both *Northwest Wholesale Stationers* and

*Indiana Federation of Dentists* should make

Decisions in other circuits support our conclusion. In *Oreck v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.) (*en banc*), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), the Second Circuit refused to apply the *per se* rule to Whirlpool's termination of Oreck as a distributor at the behest of another major distributor, Sears Roebuck. The court distinguished *Klor's*, noting that horizontal and vertical restraints merit different treatment under the antitrust laws. Although the former "have been characterized as 'naked restraints of trade with no purpose except stifling competition,'" 579 F.2d at 131 (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963)), the latter may "promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products." 579 F.2d at 131. The court then concluded that Oreck's complaint involved "an alleged agreement between a single manufacturer and a single dealer" and was, "in essence, an exclusive distributorship controversy" to which the group boycott doctrine did not apply. *Id.*

The Ninth Circuit also has held that "some concerted effort at a single market level—a horizontal combination or agreement—is requisite before the type of per se violation commonly termed a 'group boycott' can be found to exist." *Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1398 (9th Cir.) *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). Fine was a law student and frequent television game show contestant who complained that network rules which limited the appearances of non-celebrities on the shows constituted a group boycott by the shows' producers and the broadcasting networks. Observing that some horizontal concert of action was part of "the fundamental nature of a group boycott," *id.*, the court held that agreements between the networks and producers implementing the rules were verti-

cal, and therefore subject to rule-of-reason analysis, *id.* at 1398–99. A majority of the circuits appear to follow a similar rationale. *See Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1223–24 & n. 1 (10th Cir.1986), *petition for cert. filed*, 55 U.S. L.W. 3259 (1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 n. 10 (4th Cir.1985); *Construction Aggregate Transp., Inc. v. Florida Rock Indus.*, 710 F.2d 752, 776–79 (11th Cir.1983) (alternative analysis); *Products Liability Ins. Agency v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663–65 (7th Cir.1982); *Carlson Machine Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253, 1259 (5th Cir.1982). *But see M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 978 (1st Cir.1984) (citing *Klor's* in noting that horizontal combination "is not an invariable prerequisite to per se treatment of a boycott," but acknowledging the general rule that vertical combinations are subject to rule-of-reason analysis).

Lomar refers us to decisions in which vertically imposed restraints were subjected to *per se* analysis as horizontal restraints. In *Malley-Duff & Associates v. Crown Life Ins. Co.*, 734 F.2d 133 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984), a terminated insurance agent alleged a group boycott between several competing agents and a major insurance carrier. The Third Circuit, relying on *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979), concluded that although vertically imposed, the termination was horizontally motivated and "its principal impact was felt on the horizontal level." 734 F.2d at 141. The court held that if the termination was "the product of competitors working in concert with themselves or in conjunction with the [insurance] company to exclude a person or group from the market, the necessary elements of a boycott in the classical sense may be present," and would justify application of the *per se* rule. *Id.* at 142.

clear, our conclusion that some horizontal concert of action is *necessary* in this context does not imply that it is *sufficient* to justify application of the *per se* rule. In both of those cases, the Supreme Court held that concerted refusals

to deal by horizontal combinations should be examined under the rule of reason rather than the *per se* rule. *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. at 2621; *Indiana Federation of Dentists*, 106 S.Ct. at 2018.

In *Com-Tel v. DuKane Corp.*, 669 F.2d 404 (6th Cir.1982), the Sixth Circuit found a *per se* unlawful group boycott in a distributor termination case involving conduct similar to that alleged by Lomar. There, a competing distributor persuaded DuKane, an audio products manufacturer, to cease dealing with Com-Tel and to pressure its other distributors to do the same. The court drew a sharp distinction between vertical refusals to deal imposed at the request of a competing distributor and those imposed unilaterally as part of the manufacturer's own marketing policy. *Id.* at 410–411. While recognizing that the latter generally are governed by the rule of reason under *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the court held that the former cannot be defended on similar interbrand efficiency grounds, and thus they warrant application of the *per se* rule. 669 F.2d at 411–12. The court concluded that where both the source and impact of a refusal to deal are horizontal, the purpose of the restraint must have been solely to restrict intraband competition, rather than to eliminate free riders in an effort to stimulate interbrand competition. *Id.* at 412; *compare Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1198–1201 (6th Cir.1982) (rule of reason applied where manufacturer produced evidence of free rider rationale and where there was no evidence that dealer complaints motivated manufacturer refusal), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984).

We do not believe the reasoning of these cases is applicable here. As a preliminary matter, *Malley-Duff* may be distinguished on its facts because, unlike the present case, it involved an alleged combination on a horizontal level. 734 F.2d at 141. Similarly, *Cernuto* involved allegations of a price-related conspiracy, which the court cited as an independent basis both for applying the *per se* rule and for distinguishing the Second Circuit's holding in *Oreck*. 595 F.2d at 168–70. More significantly, however, we find in Lomar's interpretation of these cases no reasonable means of distinguishing the restraints to be labeled ver-

tical and treated under the rule of reason from those to be designated "vertically-imposed-but-horizontally-motivated" and analyzed as group boycotts under the *per se* rule.

We agree with the assumption that an anticompetitive impact is likely to result when restraints are imposed with an anticompetitive purpose. However, to apply the *per se* rule to the present case, we would have to assume that the purpose of a vertical restraint reasonably can be inferred from its source. This assumption we are not yet ready to make.

There is academic support for the assumption in *Com-Tel* that dealer-inspired restraints are more likely to involve purely anticompetitive motives. *See, e.g.,* VII Areeda, *Antitrust Law* ¶ 1453c at 144 and ¶ 1457 at 166–76. However, a firm's hostility toward a competitive rival is not always the proper object of antitrust concern, and may even be indicative of healthy competition. *See Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1338–39 (7th Cir.1986). Moreover, we are not prepared to accept the argument that non-price-related vertical refusals to deal, even if inspired by a competing dealer, are so predominantly anticompetitive and involve such remote possibilities of countervailing procompetitive effects, that application of the *per se* rule is appropriate. A distributor who requests the imposition of vertical restraints upon (or even termination of) a rival clearly may be acting with anticompetitive animus. However, to impose a *per se* rule on this basis is to focus solely on the distributor's role as an intrabrand competitor, and to ignore his role in interbrand competition.

The distributor may have a better understanding than his supplier of which intrabrand restraints will most significantly enhance the interbrand competitiveness of the supplier's goods at the retail level. Indeed, this expertise may be one of the main reasons for the supplier's decision to employ an independent distributor rather than to integrate vertically his own distribution network. *A fortiori*, the "market strategy" of intrabrand restraints, which the

*Com-Tel* court considered dispositive in applying a *per se* or rule-of-reason analysis, 669 F.2d at 411 (quoting *Cernuto*), often will be the product of consultations between the supplier and his distributors. To apply a *per se* rule to the supplier's solicitation of marketing advice from the distributor is to prohibit the supplier from drawing on the most important source of information in formulating and initially implementing a market strategy. To adopt the reasoning in *Com-Tel* is thus to limit the supplier's market strategy to those intrabrand restraints the supplier choses to implement without the advice of its chosen distribution "expert." This deprives the supplier of one of the primary efficiencies it seeks in vertically diversifying its product distribution.

In theory, there may be some validity in drawing a distinction between "dealer-*inspired*" and "dealer-*coerced*" restraints. As discussed above, the former may be fully consistent with a supplier's efforts to develop an efficient marketing strategy, even though the source of the restraints is one of its dealers. On the other hand, where the dealer forces upon an unwilling supplier more restrictive intrabrand restraints than the supplier would have imposed in serving his own interest in efficient distribution, there is a greater likelihood that the dealer is seeking an anticompetitive advantage. *See generally,* VII Areeda, *Antitrust Law* ¶ 1453c at 144–45. In such cases, a presumption of anticompetitive effects (and hence the application of a *per se* rule) might be justified.

Nevertheless, as an administrative matter this distinction would be very difficult to draw; the trier of fact would need to distinguish between a dealer's strong suggestion and outright demand, and between a supplier's willing acceptance and grudging acquiescence. Lomar's assertion that GF imposed the refusals to deal with Lomar on "somewhat indifferent" suppliers aptly illustrates the nebulous character of this inquiry in practice. Even if GF's motive for requesting that the suppliers refuse to deal with Lomar were clear, the individual motive of each of the suppliers in agreeing to that request is not, and Lomar has offered no evidence of the suppliers' motives.

Lomar argues that there are no sound reasons for supposing that the suppliers here were responding to efficiency-related concerns, or that GF legitimately was concerned about free-riding by Lomar on product promotion and shelf service. Brief of Appellant at 34 & n. 9. This argument misses the mark, because it focuses on the justifications for these particular refusals to deal, rather than on any predominantly anticompetitive effects of dealer-inspired refusals as a class. As we have already noted, there are potentially legitimate reasons for a distributor to request that a supplier refuse to deal with another distributor in an effort to develop a more efficient marketing policy for the supplier's goods.[5] Moreover, experience with the actual economic effects of similar restraints in the exclusive distributorship context mitigates against application of the *per se* rule. *See, e.g., JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 519 F.Supp. 1084, 1090–93 (N.D.Cal.1981), *aff'd,* 698 F.2d 1011 (9th

---

5. Competitive justifications for dealer-inspired restraints may be equally applicable to cases, like the present one, where the dealer allegedly has requested similar restraints from several suppliers. Where the plaintiff alleges a combination between the suppliers, as in *Klor's,* an element of horizontal collusion is present, which more strongly suggests a predominantly anticompetitive intent and impact. In these circumstances, our experience warrants application of the *per se* rule. *Cf. Broadcast Music, Inc.,* 441 U.S. at 9, 99 S.Ct. at 1557. However, where there is no horizontal combination, separate conspiracies between the dealer and each of the various suppliers should be evaluated individually. While a series of dealer-inspired refusals to deal may signal the dealer's anticompetitive intent, they may be equally indicative of an efficiency-related justification for the requested refusals. The same types of intrabrand restraints, such as limited or exclusive distributorships, may be especially appropriate where, as here, the products and the markets in which they are sold are extremely similar. Accordingly, Lomar's argument in favor of the *per se* rule is not bolstered by its allegation that GF requested more than one supplier to refuse to deal with Lomar; each refusal is subject to rule-of-reason analysis.

Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

■ We believe that absent any collusion at some horizontal level, "[t]he rule of reason provides a more discriminating way of differentiating" the procompetitive refusal to deal from the anticompetitive one. *Oreck,* 579 F.2d at 132 n. 6. Because Lomar's complaint alleged no combination between horizontal competitors, the District Court did not err in analogizing the refusals to deal to exclusive distributorships [6] and in awarding summary judgment to defendants on Lomar's claim that defendants violated the *per se* rule by engaging in a group boycott.

*Price Discrimination*

Lomar next appeals the District Court's ruling on its price discrimination claim under section 2(a) of the Robinson-Patman Act. Lomar alleges that GF engaged in a pattern of price discrimination involving approximately 180 products sold in competition with Lomar in the relevant market. Lomar also challenges GF's creation of a special "price zone" roughly corresponding to the territory in which Lomar and GF effectively compete, and within which GF allegedly charges lower prices on its entire line of goods. In support of these allegations, after months of discovery, Lomar produced a series of exhibits purporting to demonstrate GF's pricing below average variable cost on four of the 180 items. GF objected to these exhibits on several grounds, arguing that Lomar improperly included legal, administrative, warehouse, advertising, and certain insurance costs in computing GF's variable costs. GF also complained that the exhibits improperly compared costs and prices from different years. The District Court, observing that

Lomar failed to respond to these objections, ruled that Lomar's exhibits were insufficient to raise a triable issue of fact on GF's alleged pricing below average variable cost. *Lomar II,* 627 F.Supp. at 119–20. Moreover, the court held that Lomar had not presented any other evidence from which GF's predatory intent could be inferred. *Id.* at 120. Because the court previously had held that Lomar failed to demonstrate any anticompetitive impact of the alleged price discrimination through market analysis, *id.* at 118–19, it granted defendant's motion for summary judgment, *id.* at 120.

Lomar launches its assault on the District Court's ruling from several fronts. First, it argues that in a primary line case under the Robinson-Patman Act, a plaintiff need not demonstrate any injury to competition, because liability may be imposed solely upon a showing of harm to an individual competitor. Second, Lomar argues that in some circumstances predatory intent may be shown by proof of defendant's pricing below average *total* cost rather than average *variable* cost. Finally, Lomar contends that the District Court erroneously held that the legal, administrative, warehouse, and advertising costs were fixed rather than variable. According to Lomar, the determination of whether these costs are fixed or variable is a question of fact for the jury. Because GF's pricing on the four products in the exhibits allegedly was below average variable costs if *all* costs are assumed to be variable, Lomar argues that it was entitled to a trial on its price discrimination claims. We reject each of these arguments.

■ This Court recently has considered the elements of proof required in a Section

---

**6.** Lomar argues that Dieter's never intended to create an exclusive distributorship with GF, and that rule-of-reason analysis therefore is inappropriate. Clearly, the distinction between restraints subject to *per se* analysis and those analyzed under the rule of reason should not depend upon specific contractual terms granting an exclusive distributorship or franchise, *see Westman Comm'n Co.,* 796 F.2d at 1225, for this is to give economic significance to the mere labels which the parties attach to their agree-

ments. More significantly, Lomar's argument confuses the rationale for applying the rule of reason with the types of restraints to which the rule applies. We apply the rule of reason to exclusive distributorships and vertical refusals to deal because they are not almost always certain to have predominantly anticompetitive effects (and therefore should not be condemned as being *per se* unlawful), not because their impetus and structure are identical.

2(a) case, and we directly have addressed the first two of Lomar's arguments regarding its price-discrimination claim. In *Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir.1987), we examined the legislative history and case law interpreting the Robinson-Patman Act, and concluded that to support a Section 2(a) primary line claim, the plaintiff must "either show substantial possibility of injury to *competition* by market analysis, *or* show injury to *a competitor accompanied by predatory intent.*" *Id.* at 1341 (emphasis added). As we observed, "[i]njury to a single competitor, even in conjunction with price discrimination, can represent 'honest competition' as much as 'illegal conduct,' or even mismanagement or inefficiency by the injured competitor." *Id.* (citation omitted). Accordingly, when the evidence shows injury only to a competitor (as opposed to competition in general), we require an additional showing of the defendant's predatory intent.[7]

When necessary, plaintiffs may demonstrate predatory intent in one of two ways. In some cases, the plaintiff will present direct evidence of the defendant's predatory intent. *Id.* at 1344. More often, the plaintiff will need to demonstrate intent indirectly, through inferences derived either from the defendant's conduct (such as below-cost pricing) or from other "circumstantial factors such as defendant's relative size, entry barriers, etc." *Id.* In evaluating a defendant's pricing, there are presumptive standards for the inferences to be drawn regarding predatory intent: "prices above average total cost are legal *per se*" under Section 2(a), while average variable cost is "a marker of rebuttable presumptions, with the plaintiff holding the burden

above and the defendant below." *Id.* at 1346 (footnote omitted). Applying these standards to this case, we agree with the court below that Lomar has failed to establish an issue for the jury on its price-discrimination claim.

### A. Market Analysis

Lomar argues that the relevant market consists of only two competitors, Lomar and GF.[8] Based on this argument, Lomar apparently contends that any competitive injury to its own business results in an anticompetitive impact on the market as a whole. The flaw in this reasoning was recognized by the District Court:

> ... Lomar's assertion that it was injured in its attempt to sell the 180 items is simply a way of saying that it lost business and profits which, in turn, shows that competition was injured. The diversion of business and the corresponding loss of profits is a natural consequence of honest and vigorous competition.

*Lomar II*, 627 F.Supp. at 118. That the antitrust laws are not designed to protect individual competitors from the natural consequences of the competitive process is clear. *See Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 387 n. 3 (8th Cir.1987); *see also D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1439 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Moreover, the same axiom applies in markets containing very few or even only two firms. The distinction between injuries to *competitors* and injuries to *competition* is therefore crucial; if we fail to recognize the distinction, then the effect of the antitrust laws in the few- or two-firm

---

**7.** Lomar makes much of the District Court's observation that "a jury could reasonably find that GF and Art Stone had a goal of eliminating or weakening Lomar as a competitor." *Lomar I*, 627 F.Supp. at 111. We therefore should note at the outset that the predatory intent required under this prong of the *Henry v. Chloride* test is broader than an intent to undermine a particular competitor; it must relate to the market as a whole. As we observed in *Henry*, a showing of GF's predatory intent with regard to Lomar alone "only circles back to the injury-to-a-single-competitor standard and is inadequate in light of our decisions." 809 F.2d at 1343 n. 8.

**8.** In light of Lomar's own deposition testimony mentioning at least three other specialty food distributors in the Iowa market, the assertion clearly lacks credibility. IV App. at 56–57. However, the District Court evaluated Lomar's claims in the context of a motion for summary judgment, and therefore was restricted in making such credibility determinations. We are similarly restricted in our review of the evidence, and therefore assume *arguendo* that Lomar and GF are the only significant competitors currently in the market.

market is to prohibit all injuries to competitors, and thus to discourage legitimate competition between the small number of firms comprising the market.

As this Court previously has observed, "analysis of the injury to competition focuses on whether there has been a substantial impairment to the vigor or health of the contest for business, regardless of which competitor wins or loses." *Richard Short Oil Co. v. Texaco, Inc.*, 799 F.2d 415, 420 (8th Cir.1986). Even in a two-firm market, when one of the competitors is eliminated, other factors in the market may indicate that *competition* is not substantially impaired. For example, if entry barriers to new firms are not significant, the elimination of the competitor may not significantly affect competition as a whole, because a new firm or firms easily can enter the market to take the place of the old one. In such cases, competitive pressure from potential market entrants may still exist, and the departure of the defendant's sole competitor does not necessarily mean that competition is threatened.

In *Henry,* the plaintiff also alleged that the relevant market consisted of only two firms. However, the market in that case involved significant customer loyalty and reliance on the expertise of the existing salesmen, and there was evidence that cross-elasticities of demand for products in related markets was very low. 809 F.2d at 1342. Those factors posed entry barriers to potential competitors, and to some extent insulated the market from external competitive pressure. As a result, the plaintiff's showing of injury to competition occasioned by the plaintiff's demise (as a result of the price discrimination) was sufficient to withstand a motion by the defendant for judgment n.o.v. *Id.* at 1343.

■ However, these same considerations make it clear that Lomar has not produced sufficient evidence to support a "market analysis" theory of competitive injury under section 2(a).[9] First, Lomar has attempted to demonstrate below-cost pricing on only four of the 180 items allegedly subject to discriminatory pricing by GF. For the other 176 items, Lomar rests solely on the allegations contained in its pleadings, and on the supposed inferences to be drawn from the evidence on the four items. Through extensive discovery, Lomar had access to pricing and cost information on all 180 items. We do not believe it rational to infer from the evidence submitted on these four items that the pricing of the other 176 was below cost. Hence, if any competitive injury under section 2(a) occurred, it was solely the result of GF's pricing on the four items for which Lomar submitted price/cost comparisons.

More significantly, although Lomar characterized the 180 items as "mainstay products which *together* account for a significant part of any specialty food distributor's sales," I App. at 279–80 (emphasis added), the record shows that Lomar's sales increased by more than 20% in 1982, during the pendency of the alleged price discrimination. I App. at 211. Lomar's president still characterizes Lomar as the dominant firm in the relevant market, and Lomar admits that within the relevant geographic market, its sales exceed those of GF. *Id.* at 211–12; *see also* IV App. at 12, 56. Finally, Lomar has neither alleged nor submitted evidence to support the inference that its difficulty in selling these four items had any measureable impact on its overall viability as a competitor. A plaintiff's increased sales volume does not inevitably preclude recovery in a Section 2(a) case. *See Rose Confections, Inc.*, 816 F.2d at 387

---

9. The District Court rejected Lomar's original definition of the product market as consisting solely of specialty foods distribution. In response to a subsequent order from the District Court seeking an acceptable definition, Lomar asserted that no market definition was required, because Lomar had shown injury to itself through below-cost pricing by GF. I App. at 275–79. On appeal, Lomar apparently has recognized the importance of defining the relevant

market, and strongly asserts that the appropriate definition is a disputed issue of material fact. Lomar's earlier position arguably could be interpreted as a waiver of a "market analysis" theory of injury, relieving us of the need to address it here. However, because the District Court chose to examine the market analysis prong in its order, *Lomar II*, 627 F.Supp. at 118–19, we also address it here.

(citing *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 702, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967)). However, where there is no evidence of a "drastically declining price structure," *Utah Pie*, 386 U.S. at 703, 87 S.Ct. at 1336, or of increasing concentration in the market, *see id.* at 700, 87 S.Ct. at 1334, an increase in the plaintiff's sales volume is inconsistent with a finding that the defendant's pricing has caused competitive injury, *see Borden Co. v. FTC*, 381 F.2d 175, 179 & n. 12 (5th Cir.1967). This is especially true where the plaintiff claims to be the defendant's sole competitor. Lomar has pointed to no evidence suggesting the erosion of competition. In these circumstances, we agree with the District Court "that, despite ample opportunity, plaintiff has failed to come forward with evidence ... to support its theory that it can show anticompetitive effect through market analysis." *Lomar II*, 627 F.Supp. at 118–19.

B. Predatory Intent

■ Assuming *arguendo* that Lomar could demonstrate individual injury resulting from GF's discriminatory pricing, *Henry* requires that we examine whether Lomar also could demonstrate GF's predatory intent. For this purpose, Lomar again relies on its pricing studies of the four items. The District Court found, and we agree, that the price/cost comparisons of the four items are insufficient as a matter of law to raise a genuine issue of material fact on the question of whether GF had predatory intent.

Lomar drew its per-product cost figures for the items from GF's responses to Lomar's interrogatories. One of those responses contained a typing transposition, which GF later corrected. Addendum to Brief of Appellee at 20–21; I App. 310–11. Although Lomar now contends that this transposition raises a genuine dispute of fact, the record amply supports GF's explanation of the error. We agree with the District Court that the transposition did not raise a *genuine* issue of fact as to the pricing of that item.

■ Lomar's evidence of predatory pricing on the other three items is equally unavailing. As discussed above, we established a rebuttable presumption in *Henry v. Chloride* that a defendant's pricing above average variable costs is not predatory. The distinction between fixed and variable cost is therefore significant in this case, because GF's pricing is above its average variable costs (and hence presumptively not predatory) if, as GF urges, we exclude the legal, administrative, warehouse, advertising, and insurance costs from the calculation of GF's variable cost on the three items. Although we agree with Lomar that the characterization of costs as fixed or variable generally is an issue of fact for the jury's resolution, *see William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1038 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), we do not believe that Lomar's mere allegation that these costs are part of GF's average variable costs raises a genuine issue of material fact precluding summary judgment. If we were to hold otherwise, a plaintiff could avoid application of *Henry* in the summary judgment context simply by alleging that all of a Section 2(a) defendant's costs were variable. We decline so to undermine the standards announced in *Henry*. Accordingly, Lomar's allegations that GF's administrative and other overhead costs are variable are not, without more, sufficient to withstand GF's summary judgment motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (nonmoving party may not rest on mere allegations where it bears the burden of proof on dispositive issue at trial).

Finally, even if Lomar had made some evidentiary showing that each of the costs included in its calculations varied with output, the evidence of GF's below-cost pricing still would be fatally flawed. The District Court found that Lomar based its calculations on information supplied by GF for 1983 prices. *Lomar II*, 627 F.Supp. at 119. However, the corresponding information regarding costs was drawn from the period between September 1981 and October 1982,

during which the price discrimination allegedly occurred. The District Court therefore found that Lomar's comparison of GF's 1983 prices to 1982 costs was irrelevant. *Id.* Although Lomar attributes this discrepancy in its price/cost comparisons to "infirmities in the information supplied by [GF]," Brief of Appellant at 48 n. 16, we find no such infirmities. The correct pricing information was available in defendant's answers to Lomar's interrogatory 2a. Addendum to Brief of Appellees at 19. Even accepting Lomar's calculations of GF's variable costs, an examination of those answers reveals that none of the three remaining items was priced below average variable cost. Accordingly, we hold that Lomar has failed to raise a genuine issue of GF's predatory intent through evidence of below-cost pricing on any of the items mentioned in its complaint.

■ Because we observed in *Henry* that a plaintiff seeking damages under Section 2(a) also can demonstrate predatory intent through circumstantial factors unrelated to pricing, 809 F.2d at 1344, we must discuss briefly the evidence Lomar submits on non-price factors in the market from which we might infer GF's predatory intent.[10] Applying *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), to the Section 2(a) claim in *Henry,* we held that the Robinson-Patman defendant "must be able to create a real possibility of both driving out a rival by loss-creating price cutting and then holding on to that advantage to recoup losses; in other words, the price-cutter must be able at least to threaten domination of the market." *Henry v. Chloride*, 809 F.2d at 1345. Therefore, "[a]ccepting rational economic conduct as the standard for predation," we assume that predatory conduct will be undertaken only when success is plausible. *Id.*

Under this standard, the "circumstantial factors" adduced in Lomar's allegations and supporting documents do not raise a material issue of GF's predatory intent. An affidavit from Lomar's president states that entry barriers—approximately $1.5 million in required capital and employees with significant expertise in the wholesale grocery business—would make it difficult for potential competitors to replace Lomar in the event of its demise. I App. at 257–58. Moreover, Lomar notes that because there are allegedly only two firms in the market, the presence of these entry barriers would guarantee GF a monopoly position from which to recoup profits lost in a predatory pricing scheme. We disagree.

Lomar's argument ignores the peripheral competitors which Lomar concedes are already of at least some significance in the existing market. *See* IV App. at 11–12, 36–37, 52–56. Although Lomar asserts that at present there is very little competitive influence from these other specialty food distributors (who serve primarily other geographic areas) and from general grocery wholesalers (who have a more limited specialty foods inventory), these firms nevertheless are perfectly poised to expand their competitive presence in the market if Lomar's elimination were to generate monopoly profits for GF. Each of the firms already employs individuals with significant expertise in the wholesale grocery business, and already has made much of the required capital investment in inventory and distribution facilities. As soon as GF began to raise prices above competitive levels (in the effort to recoup losses incurred in eliminating Lomar) these other firms would have little difficulty in detecting[11] and responding to the competitive

---

10. Lomar's briefs contains numerous factual allegations regarding such factors and the composition of the relevant market, but few of the allegations are supported by specific citation to the extensive record. Apparently, Lomar has left it to the Court to sift through the record in search of the particular pleadings, depositions, answers to interrogatories, admissions, and affidavits which might raise a triable issue of fact on predatory intent. Although we have undertaken this review, we generally have been forced to speculate about which documents in the record Lomar believes support both its factual allegations and the inferences regarding GF's predatory intent that are to be drawn therefrom.

11. The evidence shows that the distributors and wholesalers carefully monitor their competitors' prices. II App. at 5; III App. at 141; IV App. at

opportunity created. These circumstances strongly suggest that predatory pricing by GF would not be rational economic behavior.

Lomar has not pointed us to any other "circumstantial" market factors from which a jury reasonably could infer that GF acted with the requisite predatory intent, nor have we discovered any in our own review of the record. Because we previously have found that Lomar failed to raise a triable issue of GF's predatory intent by any of the other methods set forth in *Henry v. Chloride*, we hold that the District Court did not err in granting summary judgment to defendants on Lomar's price-discrimination claim.

*Illegal Brokerage*

■ Lomar's final claim against GF charges defendant with receiving illegal brokerage in violation of Robinson-Patman Section 2(c). 15 U.S.C. § 13(c). Lomar charges that GF received illegal brokerage payments through two dummy corporations established for the primary purpose of collecting the payments from grocery suppliers. Lomar's sole specific allegation of injury from the alleged brokerage arrangement was based on the typing transposition contained in GF's pricing information on one of its products. *Lomar II*, 627 F.Supp. at 119–20. Based on this erroneous information, Lomar contended that GF had engaged in price discrimination on at least one item for which illegal brokerage payments allegedly were received, and that the brokerage payments were used to finance the price-discrimination scheme aimed at Lomar. The District Court rejected this contention, finding that GF's historical pricing information did not support Lomar's allegation of injury from the brokerage payments. Finding no other evidence of injury from the alleged brokerage payments, the District Court granted GF's motion for summary judgment on the Section 2(c) claim. On appeal, Lomar argues that it need not demonstrate specific injury to recover for GF's violation of Section 2(c).

Alternatively, Lomar argues that the injury from the brokerage payments lies in the extent to which the payments helped finance GF's price discrimination.

We agree with the District Court that Lomar has not demonstrated any injury from the brokerage payments, and that this failure is fatal to Lomar's standing to bring the Section 2(c) claim. Section 4 of the Clayton Act clearly requires antitrust plaintiffs to demonstrate an injury to their business or property as a prerequisite to a private action under the antitrust laws. 15 U.S.C. § 15(a). Absent this showing, a private suit based on alleged violation of Section 2(c) must fail. Lomar's citations to Federal Trade Commission enforcement actions are clearly inapposite; no injury to a competitor is required in such actions. *See FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959).

Lomar alleges that the dummy corporations were used to finance GF's price discrimination and that Lomar's injury can therefore be measured by the amount of the brokerage. However, as we already have observed, Lomar has not raised a triable issue of fact on GF's discriminatory pricing with respect to any of the items mentioned in the complaint. Accordingly, Lomar cannot point to injury allegedly sustained as a result of GF's price discrimination to bootstrap its standing to bring an action for illegal brokerage.

Absent some showing of specific injury as a result of the alleged brokerage payments, Lomar is not in a position to pursue its Section 2(c) claim; it cannot rely on an inference of injury derived from the mere allegation of a Section 2(c) violation. *See generally Haff v. Jewelmont Corp.*, 594 F.Supp. 1468, 1471–76 (N.D.Cal.1984) (nature of causal connection required between plaintiff's injury and defendant's conduct); *cf. J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–63, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981) (no automat-

---

37–38. The firms often provide price catalogues to their customers, and that the catalogues issued by competitors are an important source of information in an industry in which prices, market shares, and competitors frequently change. I App. at 215; II App. at 113, 242; IV App. at 11.

ic damages for Section 2(a) violation). Because Lomar pointed to no evidence from which a showing of injury to itself could be made, the District Court did not err when it granted GF's summary judgment motion on Lomar's Section 2(c) claim.

The orders of the District Court entering summary judgment against Lomar with respect to each of its claims are in all respects affirmed.

AFFIRMED.